Filed 6/25/15  P. v. Sanchez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065028 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD238471) |
| MANUEL SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lise Jacobson and Marilyn Lindsay George, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant Manuel Sanchez engaged in the sexual molestation of his two stepdaughters over a number of years.  The victims did not report Sanchez's conduct to law enforcement authorities until they were adults.

In his first trial, a jury found Sanchez guilty of six of the 15 counts with which he was charged.[1]  That jury was unable to reach a verdict with respect to the nine remaining counts, and Sanchez was retried on those counts.  A second jury found Sanchez guilty of the remaining counts.  Sanchez now appeals from the judgment of conviction entered after retrial on the remaining nine counts, and also appeals his combined sentence for all 15 counts.

On appeal, Sanchez claims (1) that his conviction in count 15 for acts against one of his stepdaughters is not supported by sufficient evidence; (2) that Penal Code[2] section 654 requires that two of the determinate terms to which he was sentenced (as to counts 1 and 5) be stayed; (3) that the trial court abused its discretion in sentencing him to serve all of the terms consecutively; and (4) that his sentence, which he maintains effectively

---

[1]  This court affirmed the judgment of conviction against Sanchez on those six counts on Sanchez's prior appeal in a nonpublished opinion in *People v. Sanchez* (May 6, 2014, D063406).

[2]  All statutory references are to the Penal Code, unless otherwise specified.

2

amounts to a sentence of life without the possibility of parole, violates the California and United States Constitutions' protections against cruel and/or unusual punishment.[3]

We conclude that Sanchez's contentions are without merit. We therefore affirm the judgment of conviction and sentence.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *The People's evidence*

a.    *The charged offenses*

In 1993, Mary C. began dating Sanchez. At the time, C. had two daughters from a previous marriage, seven-year-old B.M., and 11-year-old E.M. Sanchez also had three children from a previous marriage: Glory, Manny Jr., and Cesar. About a year after they started dating, Sanchez and C. married and the families moved into a new house together.

During the move into the new house, B.M. found herself alone in the new house with Sanchez. Sanchez locked the front door, looked out a peephole and a window, closed the curtains, and then sat down on a blue couch. Sanchez asked B.M. to sit on his lap, facing him, which she did. B.M. was wearing a sundress with sunflower buttons on

---

[3]    The Eighth Amendment of the United States Constitution prohibits imposition of "cruel *and* unusual punishment." (Italics added.) Section 17 of article I of the California Constitution prohibits imposition of "[c]ruel *or* unusual punishment." (Italics added.) For the sake of simplicity, when we discuss the United States and California Constitutions' prohibitions together, we will refer to the prohibited acts as "cruel or unusual punishment."

3

it (sunflower dress). Sanchez rubbed B.M.'s vaginal area over her underwear. After doing that for 10 or 15 minutes, Sanchez slid B.M.'s panties aside and inserted his fingers into her vagina. He asked B.M. whether she liked that and whether it felt good. Sanchez also took B.M.'s hand and put it on his penis, over his clothing, and had her move her hand "back and forth." B.M. was eight years old at the time. She did not tell anyone about what had happened because she was afraid that her mother would be mad at her.

On another occasion approximately a week or two after the incident on the couch, Sanchez was on a futon with a blanket on the living room floor watching movies with the family. After everyone else went to bed, Sanchez asked B.M. to stay downstairs and watch another movie with him. B.M. remembered that the movie that was playing was *Mr. Bean*. Sanchez asked B.M. to get under the blanket with him. As she did this, B.M. noticed that Sanchez's shorts were pulled down to his knees and his penis was exposed. Sanchez put B.M.'s hand on his penis and had her rub it. Sanchez then grabbed one of B.M.'s legs and rubbed her leg against his penis. He then did the same thing with her foot. All of the contact was skin to skin.

Sometime between August and December 1994, Sanchez arrived home from work and asked B.M. to go into the master bedroom with him. He shut the door and told B.M. to give him a kiss. He grabbed B.M.'s face and forced his tongue into her mouth.

During this same time period (i.e., between August and December 1994), there were other instances during which Sanchez digitally penetrated B.M., as well. When B.M. was asked at trial how many times this occurred, she said, "It all blends together for

4

me. It's hard to say a frequency of times that it happened, but he would constantly ask to give me massages, and whenever he would give me a massage, he would use that as an excuse to work his way up to my vagina, stick his fingers inside of me. And so, it happened so frequently that it's hard for me to put a number on that." The massages occurred both day and night, sometimes in B.M.'s bedroom and sometimes in the living room.

B.M. also testified about a video of her that was taken at a cabin the family had rented in Big Bear. B.M. believed that the video was taken in December 1994. She remembered that right after Sanchez videotaped her, he took her into a room in the cabin and touched her vaginal area through her clothing.

According to B.M., Sanchez's lewd conduct continued throughout 1995. She had difficulty identifying how frequently it occurred, but estimated that Sanchez would "massage" her and sexually molest her "weekly, [or] biweekly." B.M. also estimated that Sanchez put his fingers in her vagina on five to 10 occasions in 1995. B.M. testified about a camping trip to Big Sur that occurred approximately a year after the trip to Big Bear. B.M. had fallen asleep sitting in the center seat of the family minivan as Sanchez was driving. At some point she awoke and found that her pants were unzipped and Sanchez's hand was inside her underwear.

Between January 1996 and October 1997, when B.M. was 10 and 11 years old, Sanchez continued to give B.M. "massages" and digitally penetrate her. This happened so often that she could not identify the number of times that it occurred.

5

B.M. and E.M. shared a bedroom until B.M. was in middle school. During the time that they shared a bedroom, B.M. and E.M. briefly discussed Sanchez's touching them. They asked each other whether it was happening "all the time," and both confirmed that it had been.

E.M. also testified to the abuse that Sanchez had perpetrated against her. For example, a week before Sanchez married Mary, Sanchez spent the night at their apartment. Mary had gone to bed and E.M. and Sanchez were watching a movie. Sanchez had E.M. lie down on her back so that he could give her a massage. He worked his hands down to her pants and touched E.M.'s vagina, skin to skin. E.M. did not tell anyone what Sanchez had done to her.

E.M. also testified that she would frequently wake up in the bedroom she shared with B.M. to find Sanchez on the floor next to her, touching her vagina, skin to skin. E.M. stated that this conduct continued into 1995, before E.M. turned 14 on September 17, 1995. According to E.M., Sanchez would often do this while E.M. was sleeping, and she would wake up to find Sanchez's hand inside her shorts or underwear. Sometimes he would penetrate her vagina with his fingers.[4]

b.    *Additional evidence pertaining to the charged offenses*

_____

[4]    E.M. admitted that after she became an adult, she carried on a sexual relationship with Sanchez. E.M. stated that she had a drug problem, and explained that between 2003 and 2012, Sanchez would provide her with money or drugs in exchange for sex. By the time of trial, E.M. had been sober for a year and four months.

6

At some point when B.M. was in sixth grade, B.M. told her mother that Sanchez had been touching her and E.M. inappropriately. C., Sanchez, B.M. and E.M. had a meeting during which Sanchez cried and apologized, but claimed that he did not remember having done anything inappropriate. Sanchez agreed that a lock should be placed on the girls' bedroom door. However, even after a lock was installed, "the same thing kept happening."

One night in January 2012, B.M. told C. that Sanchez had continued to molest her and E.M. even after the family meeting that had taken place when B.M. was in sixth grade. Cesar came to the family home and had a private discussion with Sanchez for approximately an hour. During this discussion, Sanchez admitted to Cesar that he had touched B.M. inappropriately on one occasion, but attempted to minimize the extent of the molestation. Cesar reported Sanchez's admission to other family members and to B.M.'s boyfriend, and urged them to call the police. B.M.'s boyfriend called the police, who arrested Sanchez shortly thereafter.

c. *Evidence of uncharged sexual offenses*

The People presented evidence that Sanchez repeatedly molested Vanessa R. (Vanessa), the younger sister of his first wife, when Vanessa was between eight and 15 years old. The molestations included Sanchez touching Vanessa's vaginal area and having Vanessa rub his penis.

d. *Judicial notice*

7

The trial court took judicial notice of Sanchez's convictions after the first trial, and advised the jurors in the second trial that Sanchez had previously been found guilty on counts 2, 4, 7, 8, 10, and 12.

2.      *The defense*

Glory, Sanchez's daughter, testified that she had never seen Sanchez behave inappropriately with either B.M. or E.M.  Steve Anderson, a neighbor and friend of Sanchez's, testified that Sanchez had appeared to be a good husband who took his wife to treatments for her depression.  Anderson said that his own daughters had never complained about inappropriate behavior on Sanchez's part.

B.      *Procedural background*

The People originally charged Sanchez with 15 counts of committing a lewd act on a child (§ 288, subd. (a)).  The victim of counts 1 through 13 was B.M., and the victim of counts 14 and 15 was E.M.  The People alleged that all of the counts, with the exception of count 14, involved substantial sexual conduct, pursuant to section 1203.066, subdivision (a)(8), and that with respect to counts 6, 7, 8, 9, 10, 11, 12, 13, and 15, the offenses had been committed against more than one victim, pursuant to section 667.61, subdivisions (b), (c), and (e)(4).  The People further alleged that the information had been timely filed pursuant to the tolling provisions of section 803, subdivision (f) (counts 1-9, 14-15) and section 801.1, subdivision (a) (counts 10-13).

In November 2012, a jury found Sanchez guilty on counts 2, 4, 7, 8, 10, and 12. The jury also found true the substantial sexual conduct allegations and tolling allegations

8

corresponding with these counts. That jury was unable to reach a unanimous verdict on the remaining counts.

Sanchez was tried a second time on counts 1, 3, 5, 6, 9, 11, 13, 14, and 15. The jury in the second trial convicted Sanchez on all of the remaining counts. The jury found true the corresponding allegations related to substantial sexual conduct and the multiple victim allegations that had been realleged as to counts 6, 9, 11, 13, and 15,[5] and also found that the statutes of limitation had been tolled.

At sentencing, the trial court recalled the sentences that the court had imposed following Sanchez's first trial, in order to sentence him with respect to his convictions on all of the counts. The court sentenced Sanchez to a determinate term of 24 years in prison on counts 1, 2, 3, 4, 5, 7, 8, 10, 12, and 14, consisting of a base term of eight years on count 2, plus eight consecutive two-year terms. The court stayed imposition of sentence on count 3 pursuant to section 654. In addition, the court sentenced Sanchez to five consecutive indeterminate terms of 15 years to life on counts 6, 9, 11, 13, and 15. The cumulative sentence that the court imposed on Sanchez is 24 years plus 75 years to life.

Sanchez filed a timely notice of appeal.

III.

---

5      The first jury did not make true findings as to the multiple victim allegations related to counts 7, 8, 10, and 12, counts for which Sanchez was convicted in the first trial. The second jury did not consider the multiple victim allegations with respect to those counts.

## DISCUSSION

A.   *Sanchez's conviction on count 15 is supported by substantial evidence*

Sanchez argues that his conviction on count 15, committing a lewd act on E.M. between January 1, 1995 and September 16, 1995, should be reversed because it is not supported by sufficient evidence.  In particular, Sanchez contends that E.M.'s testimony regarding the offense alleged to have occurred in 1995 lacked sufficient specificity as to what occurred and when it occurred.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]" '  [Citations.]  [¶]  ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citation.]" '  [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

10

Count 14 alleged that Sanchez touched E.M.'s vagina, skin to skin, between August 1, 1994 and December 31, 1994. Count 15 alleged that Sanchez touched E.M.'s vagina, skin to skin, between January, 1, 1995 and September 16, 1995. Sanchez argues that E.M.'s testimony was so "generic and non-specific" regarding any incidents that occurred in 1995 that it "does not even meet the *Jones*[6] standard and was legally insufficient to support appellant's conviction as to count 15."

In *Jones*, the California Supreme Court designed an evidentiary standard to appropriately balance a defendant's right to fair notice of the charges and to a reasonable opportunity to defend against those charges with the state's need to ensure that resident child molesters are not immunized from substantial criminal liability merely because their victims are unable to recall precise details concerning the repeated incidents of abuse. (*Jones, supra*, 51 Cal.3d at pp. 305, 315-316.) The *Jones* court noted that child molestation cases "frequently involve difficult, even paradoxical, proof problems." (*Id.* at p. 305.) Child victims of "resident child molester[s]" may have "no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents." (*Ibid.*)

Given the evidentiary limitation of victims of repeated child abuse at the hands of a resident molester, the *Jones* court concluded that a child victim's *generic* testimony may be sufficient to support a conviction for sexual abuse as long as the testimony describes: (1) "the *kind of act or acts committed* with sufficient specificity, both to assure that

6       *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*).

11

unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd contact, intercourse, oral copulation or sodomy)"; (2) "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')"; and (3) "the *general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." (*Jones, supra*, 51 Cal.3d at p. 316.) "Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Ibid.*; see also *People v. Matute* (2002) 103 Cal.App.4th 1437, 1444-1446.)

E.M. testified that between late August 1994 and December of that year, Sanchez touched her vagina, skin to skin, multiple times. E.M. testified that this touching would occur under "two sets of circumstances," i.e., when he would give her "massages" and when she would wake up in the middle of the night to find him in her room, touching her. E.M. was asked whether this was "happening at least on a fairly frequent basis in that first time frame from August of '94 to December of '94," to which she responded, "Yes." E.M. was then asked whether "that conduct continue[d] that next year of '95 from the time that he started, the year in '95, all the way up until the time that [she] would have turned 14." E.M. answered, "Yes." She was then asked whether it had been one of the two previously identified scenarios, either the "massage" or waking up in the middle of

12

the night, and after she responded in the affirmative, the prosecutor asked E.M. whether one of the scenarios had occurred more often than the other. E.M. said, "I think waking up and him touching me." The prosecutor then clarified that the touching involved Sanchez touching her vagina, skin to skin. Shortly after the prosecutor asked E.M. what type of clothing she would wear to bed, E.M. described how Sanchez would "have his hand inside the shorts or underwear or—I'd wake up to that," E.M. was again asked whether "that conduct continue[d] to occur" between January 1995 and her fourteenth birthday. E.M. again replied, "Yes."

E.M.'s testimony with respect to Sanchez touching her vagina, skin to skin, as well as her testimony that this touching occurred repeatedly between January 1995 and her fourteenth birthday that year, constitutes substantial evidence to support Sanchez's conviction on count 15. Such testimony meets the evidentiary standard set forth in *Jones, supra*, 51 Cal.3d at page 314, in that it identified the kind of act Sanchez committed, described far more than the single act with which he was charged, and identified the time period during which the conduct occurred. We therefore affirm Sanchez's conviction on count 15.

B.  *Sanchez is not entitled to a stay of his sentences on counts 1, 4, and/or 5 pursuant to section 654*

Sanchez contends that two of the two-year terms that the trial court imposed with respect to counts 1, 4, and 5, should have been stayed pursuant to section 654 because, he maintains, the acts forming the basis of those counts were all part of an indivisible course

13

of conduct committed on the same occasion, i.e., the incident in which B.M. was wearing the sunflower dress.

" 'Section 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute. Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the "intent and objective" of the actor.' [Citation.]" (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1229.) " 'The defendant's intent and objective present factual questions for the trial court . . . .' [Citation.]" (*People v. Petronella* (2013) 218 Cal.App.4th 945, 964.) The trial court usually makes these determinations after hearing all of the facts and circumstances of the case at trial. (See *People v. Ross* (1988) 201 Cal.App.3d 1232, 1240.)

Counts 1 through 5 of the operative charging document alleged that Sanchez committed the following acts on victim B.M. between August 13, 1994 and December 31, 1994:

> (a) count 1 – "(to wit: hand to vagina skin to skin first time)"
>
> (b) count 2 – "(to wit: hand to penis skin to skin first time)"
>
> (c) count 3 – "(to wit: penis on leg skin to skin first time)"
>
> (d) count 4 – "(to wit: masturbation of vagina over the clothing first time)"
>
> (e) count 5 – "(to wit: digital penetration of vagina first time)."

The reference to "first time" in the counts refers to the general time period between August 1994 and December 1994, the first time frame alleged in the charging document, and not to the first incident of each type of act.[7] As Sanchez notes, the trial court stayed imposition of sentence on count 3, pursuant to section 654, after finding that it was likely that counts 2 and 3 arose from the same incident (i.e., the under-the-blanket incident), and, according to the court, "the reasonable inference is that both of those acts [hand to penis, skin to skin, and penis to leg, skin to skin] were conducted with the same intent and objective *as part of a continuous transaction*." (Italics added.) The court concluded that section 654 was not implicated by any of the other counts.

Sanchez asserts that the prosecutor's argument essentially *established* that counts 1, 4, and 5 all had to be based on the sunflower dress incident. Specifically, Sanchez argues that of the three incidents that the prosecutor argued formed the basis for the charges arising during the "first time" period, only the sunflower dress incident involved evidence of vaginal touching (count 1), masturbation over clothes (count 4), and digital penetration (count 5). Therefore, according to Sanchez, because counts 1, 4, and 5 all occurred during the sunflower dress incident, they must necessarily have occurred "on the same occasion and with the same objective of sexual gratification." We disagree with

---

[7] Counts 6, 7, 8, and 9, which used the term "middle time" were alleged to have been committed during the time frame of January 1, 1995 through December 31, 1995, and counts 10, 11, 12, and 13, which used the term "last time" were alleged to have been committed during the last time frame of January 1, 1996 through October 3, 1997.

15

Sanchez's characterization of the evidence and the prosecutor's argument about the evidence.

Contrary to Sanchez's contention, the prosecutor referred not only to the evidence about the sunflower dress incident to support the charges for the time period of August 1994 to December 1994, but in addition, specifically referenced B.M.'s other testimony about Sanchez's repeated visitations to B.M.'s room during 1994, when he would touch her inappropriately:

> "So, what other evidence do we have happening[,] going on in 1994? [¶] In 1994, we know that he was starting to do these massages. He would use massages against [*sic*] as a tool to get access to a child's . . . private parts, and that he would touch her both over the clothing [and] under the clothing during the massages. [¶] . . . [¶] We know also that during these massages, too, there were times he also digitally penetrated her. Again, *separate and apart from the first instance that she described*. Again, that this was something that she was kind of coming to expect to have happen. That's . . . some of the evidence that we heard about the 1994 time frame." (Italics added.)

Thus, contrary to Sanchez's argument on appeal, the prosecutor did not rely solely on the sunflower dress incident as the evidentiary basis for counts 1, 4, and 5. As the prosecutor noted in closing argument, B.M.'s testimony regarding Sanchez's weekly or biweekly "massages" and visits to her room at night that involved him touching her vagina and/or digitally penetrating her constituted evidence apart from the sunflower dress incident to support Sanchez's convictions on counts 1, 4, and 5. The trial court

16

could have properly concluded that these offenses did not occur during the same incident, and that separate punishment was appropriate.[8]

C.      *The trial court did not abuse its discretion in imposing consecutive terms*

Sanchez argues that although the trial court possessed discretion to impose the determinate and indeterminate sentences either consecutively or concurrently, in this case, the court abused its discretion in deciding to impose the sentences consecutively. Sanchez contends that remand for resentencing is required.

Sanchez first contends that the trial court was under the misimpression that the conduct underlying all of the counts occurred on different dates, and that if the court had properly realized that many of the acts alleged in these counts actually occurred on the same occasion, the court may not have imposed consecutive sentences.

---

[8]      Further, we question Sanchez's presumption that simply because these counts may have occurred on the same occasion, and had the same objective (i.e., Sanchez's sexual gratification), he could not be separately punished for each offense pursuant to section 654. "Generally, whether a course of conduct is a divisible transaction depends on the intent and objective of the actor . . . ." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006.) "However, the rule is different in sex crime cases. Even where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished." (*Ibid.*) Thus, " '[m]ultiple sex acts committed on a single occasion can result in multiple statutory violations. Such offenses are generally "divisible" from one another under section 654, and separate punishment is usually allowed. [Citations.]' [Citation.] If the rule were otherwise, 'the clever molester could violate his victim in numerous lewd ways, safe in the knowledge that he could not be convicted and punished for every act.' [Citation.]" (*Ibid.*)
        Thus, even if we were to have agreed with Sanchez that the acts underlying counts 1, 4 and 5 had to have occurred during the same incident, i.e., the sunflower dress incident, there is nevertheless substantial evidence in B.M.'s testimony to support a finding that each different offense that occurred during the sunflower dress incident was based on a separate, "divisible" act that occurred.

17

Second, Sanchez argues that in choosing consecutive sentences, the trial court failed to accord proper weight to evidence that Sanchez "would not be a danger to the public upon release from custody." In making this argument, Sanchez contends that the factors in mitigation in his case outweigh the factors in aggravation, and that the trial court thus should not have chosen consecutive indeterminate sentences. Sanchez argues that the court effectively sentenced him to life without the possibility of parole, that this is an "extraordinary sentence in this case" and that the sentence constitutes an abuse of the trial court's discretion.

1. *The trial court's sentencing decision*

Prior to sentencing, defense counsel submitted a statement in mitigation, arguing for the imposition of a term of eight years, to be served concurrently with the 18-year sentence that the trial court had already imposed as to counts 2, 3, 7, 8, 10 and 12, following Sanchez's first trial. In that statement, defense counsel noted that Sanchez was 58 years old at the time of sentencing and had "several health issues," including diabetes. Counsel contended that the following constituted factors in mitigation: Sanchez cooperated with arresting officers; had "no documented history of sexual crimes"; had no record of violence; was never armed with a weapon or firearm during the offenses for which he was convicted; and had an "insignificant criminal record."

The People argued in their sentencing brief that the trial court should impose sentences of 15 years to life with respect to counts 6, 9, 11, 13, and 15 because the jury had found the multiple victim allegations true as to those counts. The People also urged

18

the court to impose the sentences consecutively, arguing that the factors identified in California Rules of Court, rule 4.425(a) (rule 4.425) weighed in favor of consecutive sentencing.[9]  The People argued that because each count represented a wholly distinct sexual act, and these acts were not incidental to each other nor merely preparatory to each other, consecutive punishment was warranted.

At the sentencing hearing, the trial court indicated that it had read the probation officer's report, as well as the pleadings filed by both parties.  With respect to the five counts involving section 667.61 multiple victim findings (i.e., counts 6, 9, 11, 13, and 15), the trial court found that all five offenses were committed after the effective date of the One Strike Law, and noted that the penalty on each of those five counts was a sentence of 15 years to life.  After stating that the court was mindful that "generic testimony was presented on these counts," the court noted that the victims had been able to testify with some specificity as to certain counts, and as to the other counts, the testimony could "loosely be described as being to the effect of [']this conduct continued

---

9 All rule references are to the California Rules of Court.  The rule 4.425 factors cited by the People included:

> "(1) The crimes and their objectives were predominantly independent of each other;
>
> "(2) The crimes involved separate acts of violence or threats of violence; or
>
> "(3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

on a weekly or ongoing basis and Mr. Sanchez did pretty much the same sexual things each time.['] "  The trial court concluded, "I am . . . satisfied and find that each of the ISL counts occurred on a separate occasion from the others."

The trial court then turned to the question whether to impose the indeterminate sentences consecutively or concurrently.  On this issue, the court stated,

> "One might ask with an offender who is of Mr. Sanchez's age, doesn't it become academic or theoretical at some point if consecutive counts are imposed, that is, consecutive terms?  And, in one sense, I suppose it does.  Once a term is imposed that exceeds the expected life[time] under the actuarial tables, which is 70 years, plus or minus, it does become, in a sense, academic.

> "But it is not merely academic in another sense.  And that is this.  At some point it provides a yardstick by which the court speaks and characterizes the conduct.  And a longer yardstick means that the court announces and concludes this conduct was worse.  And I think it is appropriate, whether it would have any effect on his release date or not, to have the yardstick match the magnitude of the violations.

> "Because each of these counts occurred on a separate date, the dates spanned a considerable period of time, because of the repeated opportunities of Mr. Sanchez at any point to say, ['O]h my God, what have I done, I will never do this again,['] and yet he chose to do so, I think that yardstick requires consecutive terms for the indeterminate counts."

The court made a specific finding that section 654 did not act to bar separate punishment for any of the indeterminate counts, finding that the conduct underlying each count occurred on different dates.  The trial court proceeded to impose five consecutive terms of 15 years to life on counts 6, 9, 11, 13, and 15.

20

With respect to the determinate counts, the trial court found that section 654 precluded separate punishment on counts 2 and 3, but found with respect to the remaining counts that separate punishment was appropriate and was not barred by section 654. As to the consecutive versus concurrent sentencing issue, the court stated the following:

> "The court has the discretion to run those [i.e., counts 1, 4, 5, 7, 8, 10, 12 and 14] consecutively or concurrently. I find that each of these acts was committed on a separate occasion, however the term 'separate occasion' is defined. Each of them involved a separate sexual violation. Each of them involved the attendant infliction of emotional damage on the victim. With respect to each of them, Mr. Sanchez had the opportunity to reflect, realize that his conduct was wrong and not do it again. That, as we know, state of mind was never achieved. [¶] I, therefore, conclude that all those remaining counts should be run consecutively to count 2. . . . "

The court also addressed whether the determinate terms should run consecutively to or concurrently with the indeterminate terms. The court stated, "I believe that the yardstick that should be used to assess and measure and label Mr. Sanchez's conduct requires consecutive terms. More to the point, they were all separate occasions, all separate violations with an intent—with an opportunity to reflect and refrain. The determinate terms are, therefore, ordered to run consecutively to the indeterminate terms."

2.      *Applicable law*

The trial court retains broad discretion in determining whether sentences are to run concurrently or consecutively. "[I]n the absence of a clear showing that its sentencing decision was arbitrary or irrational, a trial court should be presumed to have acted to

21

achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive sentences ought not be set aside on review." (People v. Giminez (1975) 14 Cal.3d 68, 72.) As the People noted in the trial court, rule 4.425 states criteria that a trial court may consider in determining whether sentences should run concurrently or consecutively: "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." (Rule 4.425(a)(1)-(3).) In addition, the trial court may consider "[a]ny circumstances in aggravation or mitigation . . . in deciding whether to impose consecutive rather than concurrent sentences." (Rule 4.425(b).)

The trial court is not limited to these factors, however, as the "enumeration in these rules of some criteria for the making of discretionary sentencing decisions does not prohibit the application of *additional criteria* reasonably related to the decision being made." (Rule 4.408(a), italics added.)

3.    *Analysis*

a.    *The record does not support Sanchez's contention that the trial court mistakenly "presum[ed] the acts upon which the verdicts were based had occurred on separate occasions"*

Sanchez first argues, as he did with respect to the trial court's determination that section 654 did not apply to counts 1, 4, and/or 5, that those offenses were based on conduct occurring during a single incident. As a result, he contends, the trial court was mistaken in thinking that those counts occurred on separation occasions. As we explained in part III.B., *ante*, however, we disagree with Sanchez's argument that those counts were necessarily based on the same incident. We therefore reject Sanchez's contention that the trial court abused its discretion with respect to imposing consecutive sentences on counts 1, 4, and 5 based on a mistaken understanding as to the timing of the conduct.

Sanchez also argues that the indeterminate term counts involving B.M., i.e., counts 6 and 9 (middle time period) and counts 11 and 13 (last time period), must be *presumed* to have arisen from conduct occurring on the same occasion. Sanchez bases this argument on the "reasoning discussed in [*People v.*] *Coelho* [(2001) 89 Cal.App.4th 861 (*Coelho*)]," which, he contends, requires that the trial court "presume that the jury based its verdict on acts that occurred on the same occasion or arose out of the same set of operative facts since that would give the court the most discretion at sentencing." According to Sanchez, his convictions on those counts were based on generic testimony by B.M. that the lewd acts occurred over the course of the entire charged time period, and

23

occurred weekly or biweekly. Sanchez contends that this means that the jury's verdicts do not disclose the act or acts upon which the jury agreed to reach the verdicts for counts 6 and 9 (for the middle time period) or counts 11 and 13 (for the last time period). Sanchez argues, "Because of the vagueness of the charging document and the generic testimony presented by [B.M.], it was not possible to determine beyond a reasonable doubt which of the acts was relied upon by the jury to make its unanimous finding as to those counts."

The court in *Coelho*, *supra*, 89 Cal.App.4th at pages 886-890 developed a methodology for identifying the factual basis of a verdict in the context of determining whether a recidivist provision for *mandatory* consecutive sentences is applicable. The *Coelho* court concluded that the provision of the Three Strikes law that requires a trial court to impose a consecutive Three Strikes sentence for each current offense of which a defendant is convicted that is "not committed on the same occasion, and not arising from the same set of operative facts" as another current offense (see § 667, subd. (c)(6), (7), 1170.12, subd. (a)(6), (7)) should be interpreted to require a trial court to impose consecutive sentences only where the jury expressly found (or must have found) beyond a reasonable doubt that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts. (*Coelho, supra*, at pp. 874-884.) In the absence of an explicit or implied jury finding that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts, the court in *Coelho* held

24

that a trial court is not *required* to impose consecutive Three Strike sentences, but instead, must exercise its ordinary discretion in determining whether to impose consecutive or concurrent sentences. (See *In re Coley* (2012) 55 Cal.4th 524, 557.)

The *Coelho* court's reasoning was premised on a defendant's right under the federal Constitution to a jury trial. The *Coelho* court concluded that a sentencing court may rely only on the facts that actually formed the basis for the jury's verdict in imposing a mandatory consecutive sentence under the relevant statutory framework. (*Coelho*, *supra*, 89 Cal.App.4th at p. 876; but see *In re Coley, supra,* 55 Cal.4th at p. 557, fn. 18 [suggesting that the *Coelho* analysis may be inconsistent with the United States Supreme Court's later opinion in *Oregon v. Ice* (2009) 555 U.S. 160].) Essentially, *Coelho* invokes the "rule of lenity" where the factual basis for a verdict is unclear (*Coehlo, supra*, at pp. 885–886).

However, the "rule of lenity" is a "tie-breaking principle" of statutory interpretation (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1102, fn. 30) that is "of relevance ' "when two reasonable interpretations of the same provision stand in relative equipoise . . . ." ' " (*People v. Manzo* (2012) 53 Cal.4th 880, 889.) It is not clear that *Coelho*'s invocation of this principle in the context of sentencing is supported by the nature of the rule. However, even if the *Coelho* court was correct in applying the "rule of lenity" in the particular context presented in that case (i.e., where a mandatory consecutive sentence would be imposed), this case does not present a similar scenario. Here, the trial court was tasked not with applying a mandatory consecutive sentencing

scheme but, instead, was exercising its discretion to choose consecutive or concurrent sentencing. Thus, the appropriate question for purposes of assessing the court's finding that the offenses occurred on separate occasions is whether that finding is supported by substantial evidence, not whether the jury's verdict established that the jury found that the offenses occurred on separate occasions. As the Supreme Court explained with respect to *Coelho*, "[T]he Court of Appeal's decision in *Coelho, supra*, 89 Cal.App.4th 861, is inapposite because the *Apprendi* line of decisions does not apply to the present context. Both the United States Supreme Court and this court have expressly held that a trial court, in exercising its discretion in sentencing a defendant on an offense of which he or she has been convicted, may take into account the court's own factual findings with regard to the defendant's conduct related to an offense of which the defendant has been acquitted, so long as the trial court properly finds that the evidence establishes such conduct by a preponderance of the evidence." (*In re Coley*, *supra*, 55 Cal.4th at p. 557.)

It is obvious that on this record, there is abundant evidence to support the trial court's finding that Sanchez's offenses occurred on separate occasions and/or dates. Both victims testified to the almost weekly nature of his lewd conduct with them. Sanchez was charged with only 15 counts, despite testimony indicating that he inappropriately touched his two young victims far more times than that. The evidence clearly supports the trial court's finding that the offenses for which Sanchez was convicted occurred on separate occasions. The trial court was within its discretion to rely on that finding, in part, in concluding that consecutive sentences were warranted in this case.

26

b.     *The sentence does not exceed the bounds of reason merely because it is effectively a sentence of life without the possibility of parole*

Sanchez's alternative argument as to why the court abused its discretion in choosing consecutive sentences is the following: "Given the minimal risk of re-offense upon release as reflected in the results of the Static-99 test that the trial court overlooked and in light of the mitigating factors which outweigh the aggravating factors, the extraordinary sentence in this case ensuring certain life without possibility of parole in prison for appellant clearly constitutes an abuse of the discretion which must be reversed."

We disagree that the court's sentencing choices constitute an abuse of discretion. The trial court very clearly weighed a number of factors, and ultimately concluded that the nature of Sanchez's offenses, including the fact that the offenses took place over a number of years, were committed against two young victims who lived in his household, and that at any point in time he could have reflected and decided to stop the abuse but did not, warranted a lengthy sentence. This is sufficient to support the trial court's choice of consecutive sentences: "Articulation of one criterion for the imposition of a consecutive sentence is sufficient." (*People v. Bravot* (1986) 183 Cal.App.3d 93, 98.) As the trial court stated, the "magnitude" of Sanchez's offenses alone warranted a significant sentence, even one that essentially means that Sanchez will spend his life in prison. We cannot conclude that such a determination exceeds the bounds of reason, all circumstances being considered.

27

D.      *Sanchez's sentence does not constitution cruel or unusual punishment*

The trial court sentenced Sanchez to a determinate term of 24 years plus 75 years to life.  Sanchez argues that this is the functional equivalent of a sentence of life without parole, and that because of the severity of this sentence when compared with the nature of the offenses, the sentence is cruel or unusual, in violation of both the state and federal Constitutions.

Sanchez did not raise this issue in the trial court. Although Sanchez "has technically forfeited the issue on appeal because he did not raise the objection below [citation], we 'shall reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim.' [Citation.]" (*People v. Russell* (2010) 187 Cal.App.4th 981, 993.)

1.      *Sanchez's sentence does not violate the California Constitution*

A sentence may violate the state constitutional ban on cruel or unusual punishment if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity. ' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 (*Dillon*).)  In *People v. Romero* (2002) 99 Cal.App.4th 1418, 1431-1432 (*Romero*), the court outlined the well-established framework for considering claims of cruel or unusual punishment under the state Constitution:

> " 'In order to determine whether a particular punishment is disproportionate to the offense for which it is imposed, we conduct a three-pronged analysis.  [Citations.]  First, we examine the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.  A look at the nature of the offense

28

includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether "the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." [Citation.] Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions.' [Citation.]"

A defendant must overcome a considerable burden in order to establish that the sentence is disproportionate to his level of culpability, and successful challenges to proportionality are an "exquisite rarity." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.)

   a.    *Nature of the offense/offender*

An examination of the nature of the offenses of which Sanchez was convicted—i.e., 15 counts of committing lewd acts with children under 14 years of age, based on Sanchez's years of continuing molestation of his two stepdaughters—reveals that the offenses are serious, severe, and have had lasting negative repercussions on his victims, who were vulnerable young girls to whom he had access because of his role as their stepfather. Sanchez's crimes are very serious.

Certainly, Sanchez's sentence is substantial in part because of the consecutive sentences. But "we cannot say that the imposition of consecutive sentences for multiple sex offenses shocks the conscience . . . ." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531 (*Bestelmeyer*).) "[A]ppellate courts have held that lengthy sentences for

29

multiple sex crimes do not constitute cruel or unusual punishment." (*Ibid.*; see *Retanan*, *supra*, 154 Cal.App.4th at p. 1231 [135-years-to-life sentence for 16 felony counts and one misdemeanor count based on sexual molestation of four children was not cruel or unusual punishment]; *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1278-1282 [life sentences for sex offenders mandated by California's One Strike law do not constitute cruel and unusual punishment]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1134-1136 [375-years-to-life sentence based on 19 felony convictions arising from sexual assaults of three women and recidivism was not cruel or unusual]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666-667 [283-year sentence upheld].)

With respect to our examination of the nature of the offender, the inquiry is on "such factors as his age, prior criminality, personal characteristics, and state of mind." (*Dillon, supra*, 34 Cal.3d at p. 479.) In this regard, Sanchez notes that his prior record is minimal, in that his only convictions, for disturbing the peace and a drug offense, are 30 years old. He also notes that in the 15 years between when he stopped molesting his stepdaughters and when he was convicted of these offenses, "there was no evidence that he had behaved inappropriately with any child under the age of 18." However, Sanchez's minimal criminal history, and the absence of evidence of additional misconduct during the intervening years between his final molestation of these girls and his arrest, do not outweigh the nature of these offenses, the fact that he committed them on a weekly basis over a period of years, or the fact that his conduct continued even after the molestation was initially revealed and the girls had a lock installed on their bedroom door.

30

In sum, we cannot conclude that Sanchez's sentence is so disproportionate to the offenses or the offender so as to shock the conscience of the court. (Cf. *Bestelmeyer, supra*, 166 Cal.App.3d at pp. 530-531 [term of 129 years for 25 felony counts, including forcible sexual offenses not disproportionate to the offender who had no prior record, only victimized his stepdaughter, and was suffering from mental impairment at the time of the crimes].)

        b.     *Comparison with punishments for more serious offenses in California/punishments for similar cases in other jurisdictions*

Sanchez cherry picks a few instances that he contends demonstrate that defendants "who have engaged in a far more egregious pattern of criminal conduct have received substantially *lesser* punishments." Rather than demonstrate that certain classes of more serious crimes consistently provide for less severe sentences, Sanchez cites three particular cases in an attempt to demonstrate the disproportionality of his sentence, including (a) a case in which a defendant received a sentence of 15 years to life, plus seven years, for raping a vulnerable neighbor during a burglary, (b) a case in which a defendant received a 30-year prison term after being convicted of five counts of forcible rape, five counts of unlawful sexual intercourse, and one count of committing a lewd and lascivious act upon a child under 14 years of age, and (c) a case in which a defendant received a sentence of 37 years eight months for his conviction for multiple burglaries with the intent to commit rape and multiple counts of rape by means of force, violence,

31

duress, menace, or fear of immediate death, and one count of unlawful bodily injury with a deadly weapon.

One can always find single instances in which a particular defendant's sentence for seemingly "more serious" crimes is, in a particular application, "less severe" than the sentence imposed with respect to another defendant. This does not mean, however, that the punishment prescribed for more serious crimes in California is, as a general proposition, less severe than the sentence Sanchez received in this case.

Sanchez makes essentially the same argument with respect to the punishment prescribed for offenses in other jurisdictions. In fact, rather than compare his sentence to sentences prescribed for *similar* criminal conduct in other jurisdictions, Sanchez compares his sentence to specific sentences imposed on particular defendants for what he maintains is "much more significant criminal conduct," and asserts that those particular defendants "received lesser sentences in other jurisdictions." Sanchez fails to compare the sentencing schemes in other jurisdictions for multiple sexual crimes against multiple child victims with the sentencing scheme applied to him, which we take as a concession that his sentence would withstand a constitutional challenge based on such a comparison. (See *Retanan, supra,* 154 Cal.App.4th at p. 1231.)

Although the sentence imposed by the trial court is significant, so were Sanchez's crimes. The sentence is not " 'so disproportionate to the crime for which it [was] inflicted that it shocks the conscience and offends fundamental notions of human dignity' "

32

(*Dillon, supra,* 34 Cal.3d at p. 478).  Consequently, the sentence does not constitute cruel or unusual punishment under state constitutional principles.

>    2.    *Sanchez's sentence does not violate the United States Constitution*

The Eighth Amendment, which applies to the states through the Fourteenth Amendment to the United States Constitution, "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 (*Ewing*) (plur. opn. of O'Connor, J.), quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997.)[10]  The Eighth Amendment " 'does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing*, *supra*, at p. 23.)

As with claims under the California Constitution, in determining whether a sentence violates the federal constitutional guarantee against cruel and unusual punishment, a court may consider "the gravity of the offense and the harshness of the penalty." (*Solem v. Helm* (1983) 463 U.S. 277, 292.)[11]  "Outside the context of capital punishment, successful challenges to the proportionality of particular sentences [under

---

[10]    Chief Justice Rehnquist and Justice Kennedy joined the plurality opinion, while Justices Scalia and Thomas filed opinions concurring in the judgment, concluding that the Eighth Amendment contains no proportionality principle.  (*Ewing*, *supra*, 538 U.S. at pp. 31-32 (conc. opns. of Scalia, Thomas, Js.).)

[11]    Contrary to Sanchez's contention, "intercase proportionality review is not required by the Eighth Amendment to the federal Constitution." (*People v. Jackson* (2014) 58 Cal.4th 724, 774.)

the federal Constitution are] . . . exceedingly rare."  (*Rummel v. Estelle* (1980) 445 U.S. 263, 272.)

In *Ewing*, the United States Supreme Court considered whether a sentence of 25 years to life under California's Three Strikes law violated the Eighth Amendment.  Ewing was convicted of grand theft for shoplifting three golf clubs valued at $ 1,200.  He had previously been convicted of four serious felonies, including a robbery and three burglaries stemming from a single case, and his criminal record included numerous theft related convictions, and convictions for drug possession, battery, burglary, unlawful possession of a firearm, and trespassing.  (*Ewing*, *supra*, 538 U.S. at pp. 17-18, 20.)  The United States Supreme Court concluded that Ewing's sentence did not violate the Eighth Amendment, reasoning that "Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record."  (*Ewing*, *supra*, at pp. 29-30.)  The court noted that although Ewing's sentence was a long one, "it reflect[ed] a rational legislative judgment, entitled to deference, that offenders who have committed serious or violent felonies and who continue to commit felonies must be incapacitated."  (*Id*. at p. 30.)

If a term of 25 years to life is not grossly disproportionate for a petty theft offense, with prior felony convictions, Sanchez's sentence of 75 years to life does not strike us as grossly disproportionate for multiple sexual abuse crimes committed against two children over a multi-year period.

IV.

DISPOSITION

The judgment is affirmed.


                                                        _____
                                                                            AARON, J.


WE CONCUR:


_____
            HALLER, Acting P. J.


_____
            McDONALD, J.