[No. C049493. Third Dist. Aug. 14, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS RETANAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I. and III. of the Discussion.

**COUNSEL**

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BUTZ, J.**—A jury convicted defendant Louis Retanan on 16 felony counts and one misdemeanor count of sexual offenses against R.S. (counts 1–7), B.L. (count 9), R.F. (counts 10–14), and R.G. (counts 15–18) as follows: aggravated sexual assault of a child under 14 years of age (Pen. Code, § 269, subd. (a)(1)—count 1),[1] six counts of committing a lewd or lascivious act upon a child under the age of 14 by force or fear (§ 288, subd. (b)(1)—counts 2–7), one misdemeanor count of annoying or molesting a child under the age of 18 (§ 647.6, subd. (a)—count 9), and nine counts of committing a lewd and lascivious act upon a child under the age of 14 (§ 288, subd. (a)—counts 10–18). The jury also sustained allegations that the offenses in counts 1 to 7 and 10 to 18 were committed against two or more victims within the meaning of the one strike law (§ 667.61, subd. (e)(5)).

The trial court sentenced defendant to separate terms of 15 years to life on each felony count as follows: consecutive terms for counts 1 through 7, 10 and 15, and concurrent terms for counts 11 through 14, and 16 through 18. The court imposed a concurrent term of one year in county jail for the misdemeanor violation. Defendant's total state prison term was 135 years to life.

---

[1] Undesignated statutory references are to the Penal Code.

Defendant appeals, contending (1) the trial court erred in failing to instruct on section 288 as a lesser included offense of section 269; (2) the trial court's finding under section 667.61, subdivision (g) that the offenses were committed on separate occasions violates *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*); (3) there was insufficient evidence to support a finding that there were four separate molestations of R.G.; (4) the imposition of full consecutive sentences under section 667.6, subdivision (d) violates *Blakely*; and (5) his sentence of 135 years to life constitutes cruel and unusual punishment.

We reject the contentions and shall affirm.

## FACTUAL BACKGROUND

At the time of trial, defendant was 40 years old.

*R.F. and R.G.*

R.F. was born in March 1989. R.F.'s cousin, R.G., was born in July 1988. R.F.'s father, Michael F., had been friends with defendant since 1986. From March through November of 1997, Michael F. lived with defendant in a house in Rancho Cordova. Defendant owned the house, and Michael F. paid him rent.

R.F. lived with her mother in Stockton. She visited her father on weekends during the school year and took longer visits during the summer. R.G. would occasionally sleep over with R.F. during these visits. Defendant would watch R.F., her two brothers and R.G. when R.F.'s father was away.

Defendant jointly molested R.F. and R.G. several times. According to the testimony of R.G., this happened once when R.F. and R.G. were sleeping over at the Rancho Cordova residence. The two girls were asleep on the couch when defendant started to touch them. He forced them to touch and kiss each other. Defendant placed a finger in R.G.'s vagina.

Another time, at R.G.'s grandmother's house,[2] defendant made the girls shower together while he watched them. He then took the girls "in the room and scooted us together while we didn't have our clothes on."

---

[2] In November of 1997, defendant moved out of the house he shared with Michael F. to live with his parents in their South Sacramento house. Michael F. stayed in the house and his parents, the grandparents of R.F. and R.G., moved in with him.

On the following day, defendant watched R.F. and R.G. shower together. After the shower, defendant had the girls touch each other's vaginas. The girls then got dressed.

Later that day, the two girls were in a room with defendant and R.F.'s two brothers. The boys were watching television while defendant and the girls were lying on a bed. Defendant touched the girls, including putting his finger inside R.G.'s vagina. He made the girls touch each other and kiss each other while they were under a blanket. Defendant then took a Polaroid photograph of R.F. with her pants off.

Other molestations took place on a trip to Reno. R.F., her two brothers, Michael F., R.G. and defendant stayed in a hotel during a three-day trip to Reno. While Michael F. was away from the room and the two boys were asleep, defendant made the girls take their clothes off and kiss each other. Defendant had intercourse with R.F. while R.G. was kissing her. The girls were molested all three days they were in Reno.

R.G. testified defendant molested her three times in Reno, twice at her grandmother's house, and once at his house. She was around seven or eight when defendant molested her. The incidents took place on different days, but happened in the same year. Defendant told R.G. if she said anything about this he would "kill the person that [she] love[d] the most." R.G. took this to mean her grandmother.

R.F. also testified that she and her cousin R.G. were made to kiss each other. Defendant would touch both of them on their breasts and vagina. Defendant had intercourse with R.F. while R.G. was lying next to her. This happened more than once. She was around nine at the time, and R.G. was around 10. R.F. saw defendant molest her two-year-old cousin around this same time.

R.F. was also molested when she was alone with defendant. The molestations started when she was five or six and continued until she was about nine. Defendant started having intercourse with her when she was around eight or nine. He had intercourse with R.F. at least five times, including one or two times in Reno. The molestations took place at defendant's house in Rancho Cordova when her father rented from him, at defendant's parent's house near Mack Road, and in Reno while on a trip.

R.F. stated defendant "touched [her] in ways he shouldn't have—or [that she] didn't want him to." He would touch her vagina with his hand and his mouth. This happened more than 20 times.

R.F. unsuccessfully tried to stop the molestations by hitting defendant on the shoulder. She did not tell anyone because defendant had told R.F. and her cousin "that if [they] ever said anything to anyone he would hurt someone in [their] family that [they] really love[d]." R.F. was afraid of defendant, stating she didn't tell anyone, "Because [she] was scared . . . [and] didn't want anything to happen to anyone." She said that "[w]hen [she] was little [she] didn't know that what [she] was doing was wrong or what he was doing was wrong. [She] didn't know what was going on." When she finally told him what he was doing was wrong, defendant said, "So what."

R.F. told her father about the molestations in approximately May of 1998. Michael F. waited until November 1998 to report the crimes to the police because he did not think his friend would do this to his daughter. Michael F. mentioned R.F.'s accusations to defendant, who denied them.

*R.S.*

R.S. was born in March 1992. She lived in defendant's house between October of 2002 and April of 2003. Her mother and sister also lived there, as well as defendant and two of his friends. R.S. testified that in March and April of 2003, defendant molested her at his house on at least seven different days when she was between 10 and 11 years old.

Defendant once tried to seduce R.S. when she was getting a cat in his bedroom. Defendant took both their clothes off and then got on top of R.S. while she was on the bed. Defendant "started going up and down on [her] body." R.S. tried to get up, but defendant pushed her back down.

On another occasion, R.S. went to use the bathroom in defendant's room. Defendant opened the bathroom door to watch her. R.S. told him to leave, but defendant refused. R.S. tried to walk out of the room, but defendant grabbed her arms and pulled her back. Defendant took off her pants and his clothes. He felt R.S.'s breasts under her shirt while his body went up and down over her.

A different incident occurred in defendant's living room. R.S. was on the couch watching television, when defendant came out naked, pushed her down, and had intercourse with her. R.S. tried to push defendant off, "but he pushed [her] back down." Defendant also put his fingers in her vagina. R.S. then tried to go back into her room to put her clothes on, but defendant blocked the door and dragged her back so that she could masturbate him.

Another incident happened in defendant's room. Defendant took R.S.'s pants off and orally copulated her. R.S. did not try to stop him because she knew defendant would push her down.

Defendant had intercourse with R.S. on at least two separate days. On another day, R.S. had to orally copulate defendant in the kitchen. She did not try to stop or get away as "his hand was on [her] back pushing [her] back and forth."

Another time defendant had R.S. orally copulate him in his bedroom. Defendant also got on top of her, moving his body up and down over R.S. Defendant tried to get R.S. on top of him.

R.S. orally copulated defendant on two separate occasions. Defendant touched her breasts at least three different times. Every night defendant would kiss her good night and try to put his tongue in her mouth. He once tried to put her mother's rubber dildo in her. Defendant had R.S. engage in mutual oral copulation with him in his bedroom.

The molestations took place primarily on Saturdays, but also on a few weekdays. The weekday molestations happened between the time R.S. got home from school and her mother returned from work. R.S. was last molested on April 22, 2003. R.S. did not tell her mother "[b]ecause [she] was scared" and afraid of "[b]eing taken away from her."

Linda R., the mother of R.S., testified that defendant offered to let her live with him so that she could stop using drugs. Linda R. paid rent and slept in the garage, while R.S. shared a room with her older sister. Defendant had his own room, and would often babysit R.S.

Linda R. once came home to find defendant with his shirt off and lying under a blanket with R.S. After R.S. was taken by Children's Protective Services, defendant was arrested. Defendant accused Linda R. of French-kissing R.S. She never French-kissed her daughter.

*B.L.*

B.L. was born in August 1993. She would go over to play with R.S. when R.S. lived at defendant's house. When she was over there, defendant would rub her back, thighs, shoulders and chest. He also put his hands under B.L.'s shirt. B.L. saw defendant do bad things to R.S., but she could not remember the details.

*Defense Case*

Felisa H., defendant's mother, testified she saw Linda R. French-kiss R.S. during a trip to Disneyland. She did not report the incident because R.S. and her mother ran off to go on rides.

Defendant testified that he had kicked Michael F. out of his Rancho Cordova house for not paying rent. Michael F. responded by threatening to call the police about his daughter R.F.'s accusations of molestation by defendant.

According to defendant, R.F. and R.G. were caught naked together by R.F.'s brothers. The girls then went to their grandmother and accused defendant of molesting them even though defendant had not been there.

Defendant suspected Linda R. was molesting R.S. In spite of this, he had proposed marriage to Linda R. Defendant denied all allegations of molestation by the victims. He was very busy with errands on the first three Saturdays in April of 2003.

## DISCUSSION

### I. Lesser Included Offense Instruction Not Warranted[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II. Section 667.61, Subdivision (g) Findings Do Not Violate *Blakely*

Defendant contends the majority of his one strike sentences were derived in a manner contrary to *Blakely*.

---

[*]See footnote, *ante*, page 1219.

■ Former section 667.61[3] then, as now, required a trial court to sentence a defendant to a lengthy indeterminate term for certain sex crimes where aggravating circumstances are present. Subdivision (c) specifies the crimes subject to the one strike scheme and the aggravating circumstances are defined in subdivisions (d) and (e). A person convicted of one of the offenses in subdivision (c) is subject to a sentence of 15 years to life if one of the aggravating circumstances listed in subdivision (e) is present. (§ 667.61, subd. (b).)

■ Section 667.61, former subdivision (g) provided that a one strike sentence "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion." If there are multiple victims during a single occasion, then the sentence shall be imposed once for each victim. (*Ibid.*; see current § 667.61, subd. (i).)

The information alleged the aggravating circumstance that defendant committed the crime against two or more victims (§ 667.61, subd. (e)(5)) in counts 1 through 7 and 10 through 18, the lewd act against a child counts regarding R.S., R.F. and R.G. The jury sustained all of the allegations.

The trial court found "that each of the crimes occurred on separate dates or at separate times." The court also declared the jury verdicts reflected this finding, and it agreed with the jury's assessment. Accordingly, the trial court sentenced defendant to a 15-year-to-life one strike term in counts 2 through 7 and 10 through 18.

■ Under *Blakely*, any fact other than recidivism that increases the punishment beyond the maximum a trial court may impose on facts necessarily reflected in the jury verdict for the offense must be the subject of a jury finding. (*Blakely, supra*, 542 U.S. at p. 303 [159 L.Ed.2d at pp. 413–414].) Defendant claims the section 667.61, subdivision (g) finding of separate offenses is a fact that increases the maximum sentence and is therefore subject to the rule of *Blakely*.

According to defendant, five of the six one strike sentences imposed in counts 2 through 7 for crimes against R.S. must be reversed for *Blakely*

---

[3] Section 667.61 was amended in 2006. (Stats. 2006, ch. 337, § 33, eff. Sept. 20, 2006.) Since the amendment was effective after defendant's crimes, it has no bearing on his claim. All subsequent references are to former section 667.61. (Stats. 1998, ch. 936, § 9.)

violations, as well as four of the five sentences in counts 10 through 14 for crimes against R.F., and three of the four life sentences in counts 15 through 18 for crimes against R.G.

The Attorney General asserts defendant forfeited these claims by failing to raise a *Blakely* objection. Assuming, without deciding, that defendant did not forfeit his claim by failing to object at sentencing, his argument fails.

As previously noted, section 667.61 provided for a term of 15 years to life for any qualifying offense listed in subdivision (c) in which the trier of fact finds one of the special circumstances in subdivision (e). This is the maximum statutory penalty that can apply for any offense coming within section 667.61, subdivision (b).

■ We find subdivision (g) of section 667.61 to be closely analogous to section 654. "Section 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute. Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267 [104 Cal.Rptr.2d 641] (*Cleveland*).) A defendant may be punished only once for all offenses incident to a single objective, but where the defendant had more than one objective, "the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*Id.* at pp. 267–268.)

■ Section 654 "is a discretionary benefit provided by the Legislature to apply in those limited situations where one's culpability is less than the statutory penalty for one's crimes." (*Cleveland, supra*, 87 Cal.App.4th at p. 270.) The rule of *Blakely*'s predecessor, *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], does not apply to the determination that defendant does not come within section 654 because that finding is not a factual determination made by a judge that increases the maximum statutory penalty for the particular crime or crimes. (*Cleveland*, at p. 271.)

■ We find the same reasoning applies to section 667.61, subdivision (g). The maximum penalty in defendant's case was established when the jury convicted him of the predicate offenses and sustained the special circum-

stance allegations. Subdivision (g), if it applied, would only act to reduce liability if defendant's culpability was less than the statutory penalty for his crimes. Mitigating the maximum statutory punishment does not fall within the rule of *Blakely* and *Apprendi*. The trial court's finding that the subdivision (g) exception does not apply because the offenses are separate does not increase defendant's maximum sentence.

██ Even if we were to hold that *Blakely* required the jury to make the section 667.61, subdivision (g) finding, any error would be harmless. *Blakely* is subject to harmless error analysis. (*Washington v. Recuenco* (2006) 548 U.S. 212 [165 L.Ed.2d 466, 472, 126 S.Ct. 2546].) The evidence overwhelmingly proved defendant committed the charged offenses against the victims on separate occasions. We are convinced beyond a reasonable doubt that the jury would have found that the offenses were separate under section 667.61, subdivision (g). (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824].)

Defendant also contends the trial court's finding that the offenses against R.G. took place on four separate occasions is not supported by substantial evidence. R.G. testified that she and R.F. were molested on three separate days, with two distinct incidents occurring on the last day. On that last day, the girls were molested, put their clothes back on, and then were later molested as R.F.'s brothers were in the same room watching television. The trial court's finding that each of the molestation counts involving R.G. took place on separate occasions is supported by substantial evidence.

### III. Consecutive Sentences Do Not Violate *Blakely*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. Sentence Is Not Cruel and Unusual Punishment

Defendant's final claim is that his sentence of 135 years to life is cruel and unusual punishment because he cannot possibly serve the imposed sentence. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) We recognize the sentence imposed is substantially longer than his possible lifespan.

██ A punishment violates the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173 [49 L.Ed.2d 859, 875, 96 S.Ct. 2909].) A punishment may violate article I, section 17 of the California Constitution if "it is so disproportionate

---

[*]See footnote, *ante*, page 1219.

to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921] (*Lynch*).)

We analyze three criteria to determine whether a sentence is "cruel or unusual" under article 1, section 17 of the Constitution of California: the nature of the offense and the offender (with particular attention to the degree of danger both present to society); a comparison of the sentence with those for other more serious offenses under California law; and a comparison of the sentence with those in other states for the same offense. (*Lynch, supra*, 8 Cal.3d at pp. 425–427.)

We note defendant makes no effort to compare his sentence with more serious offenses in California or with punishments in other states for the same offense, which we take as a concession that his sentence withstands a constitutional challenge on either basis. (*People v. Crooks* (1997) 55 Cal.App.4th 797, 808 [64 Cal.Rptr.2d 236] [defendant bears burden of establishing disproportionality].)

Defendant's sole support for his claim is a concurrence stating that any sentence longer than the human lifespan is inherently cruel and unusual. (*People v. Deloza* (1998) 18 Cal.4th 585, 600–601 [76 Cal.Rptr.2d 255, 957 P.2d 945] (conc. opn. of Mosk, J.).) As we stated when confronted with the same argument in *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 [108 Cal.Rptr.2d 243], " 'no opinion has value as a precedent on points as to which there is no agreement of a majority of the court. [Citations.]' [Citations.] Because no other justice on our Supreme Court joined in Justice Mosk's concurring opinion [in *Deloza*], it has no precedential value." Accordingly, there is no authority for defendant's argument.

California courts repeatedly have upheld such lengthy prison sentences. (See, e.g., *People v. Wallace* (1993) 14 Cal.App.4th 651, 666–667 [17 Cal.Rptr.2d 721] [upholding sentence of 283 years eight months]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531–532 [212 Cal.Rptr. 605] [upholding sentence of 129 years].) Defendant was convicted of numerous sex crimes against four young girls, including the rape of a 10-year-old. He attempted to silence two of his victims by threats against the life of the person they loved the most. His many offenses were made possible by exploiting the trust of his victims' parents.

Defendant's sentence is not disproportionate to the offender or the offenses. His claim of cruel and unusual punishment is without merit.

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Robie, J., concurred.

A petition for a rehearing was denied September 5, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 12, 2007, S156658.