Filed 4/28/16  P. v. Croft CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>      v.<br><br>JAMES CROFT,<br><br>   Defendant and Appellant. | G051591<br><br>(Super. Ct. No. 13NF0774)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

James Croft appeals from a judgment after a jury convicted him of four counts of lewd act upon a child under 14 years of age and found true multiple victim and substantial sexual conduct enhancements. Croft raises numerous evidentiary, instructional, and sentencing errors. Although we conclude one of the evidentiary claims has merit, Croft was not prejudiced. None of his other contentions have merit. We affirm the judgment.

                                                    FACTS

*Background*

Croft and T.C. (Mother), married in 1993, and had three children together: a son, D.C., born in 1994, and two daughters, M.C., born in 1995, and A.C., born in 1998. Croft, Mother, and the children lived in Texas. D.B., T.M., and their daughter N.B., who was born in March 1996, lived with them. Croft and Mother were N.B.'s godparents. Croft, Mother, and the children moved to Buena Park in 2000; Croft moved in early 2000, and Mother and the children moved in May 2000. While Mother worked, Croft would watch the children. M.C. could not start kindergarten in September 2000, because she turned five years old a few weeks after school started. In September 2001, M.C. turned six years old and attended kindergarten at P.E.[1]

*M.C.*

On one occasion, Croft picked up M.C. from kindergarten, took her to the Rite Aid where he worked to buy her "hot Cheetos," and took her home where they were alone. Croft took M.C. into his bedroom, took off her clothes, put her face down on the bed with her face buried in a pillow, and told her that she was in trouble. M.C. heard Croft unfasten his belt, unzip the zipper, and drop his pants where they rested around his ankles. Croft stood at the end of the bed and held M.C.'s buttocks in the air. Croft put

---

[1]        The Attorney General states M.C. turned five years old in 2001. M.C. was born in September 1995 and turned five years old in September 2000. She turned six years old and started kindergarten in September 2001.

                                                      2

his cold penis inside M.C.'s "butt" and moved it in and out. M.C. cried, screamed, and told him to stop, but her face was buried in the pillow. M.C. did not know whether Croft ejaculated, but after he stopped, he wiped her off with a towel and told her to leave. Croft sodomized M.C. in this manner on more than one occasion during M.C.'s kindergarten year.

On another occasion during her kindergarten year when Mother was at work, Croft put all the children to bed and told M.C., who was in her nightgown, to count to 100 and come into his bedroom. M.C. pretended to be asleep, and Croft returned to her bedroom, woke her up, took her into his bedroom, and took off her nightgown. Croft put her in the same position and sodomized her. After he finished, Croft told M.C. to sleep with him that night and if Mother asked to tell Mother that she wanted to watch television.

During Christmas 2001, Croft and the children were decorating the tree. Croft told M.C. to come into his bedroom because she was in trouble. After Croft took off M.C.'s clothing and told M.C. to get on the bed, family arrived. Croft told M.C. to get dressed quickly, and he left the bedroom.

On two other occasions, Croft had M.C. lay on the bed on her back with a pillow over her face. He tried to put his penis in her vagina but when M.C. screamed he stopped. M.C. did not tell anyone what happened because she was afraid of Croft.

*A.C.*

A.C. was two years old when the family moved to California in May 2000. Croft watched A.C. during the day when Mother worked and her siblings were at school. On one occasion in 2001, Croft told three-year-old A.C. to come into his bedroom. He told her to take off her clothes and to get onto the bed. He told her to get on her knees and put her face on a pillow so her buttocks was in the air. He spread lubricant on A.C.'s buttocks, which felt cold. Croft put his penis in her anus and moved back and forth. A.C. cried. When he was done, Croft told A.C. to get dressed and leave. A.C. did not

3

tell Mother because she was scared. A.C. stated Croft sodomized her "a lot" when they were home alone during 2001 and 2002.

*Aftermath*

In May 2002, when M.C. was in kindergarten, Mother separated from Croft. He moved to Texas and soon moved in with M.M. and they had a daughter. Croft returned to Orange County on two occasions. In 2003, Croft stayed with Mother and the children for a week. On another occasion, Croft flew to Orange County and he and the children took a bus to Texas. The following year, the children were scheduled to fly to Texas. At the airport, M.C. became hysterical and refused to go; D.C. and A.C. went.

In 2008, N.B. was in sixth grade and took a sexual education class where she learned about sexual assault and that the victim was not to blame. N.B., who was living with her aunt and uncle in Texas because her mother, T.M., was stationed out of state, told her aunt that Croft had molested her. N.B.'s aunt took N.B. to the police station, where officers and the child abuse services team (CAST) interviewed her. A day or two later N.B. told T.M. that Croft molested her. When T.M. was deployed overseas in Afghanistan, she e-mailed Mother and told her that N.B. reported Croft had molested her. Mother spoke with her three children in a group and asked them if anyone had touched them inappropriately. The children said, "No." M.C. was afraid to tell Mother what Croft had done.

One day in March 2011, Mother picked up 15-year-old M.C. and 13-year-old A.C. from school. M.C.'s grades were subpar, and A.C. was acting out at school. Mother asked them why they did not behave for her like they behaved for Croft. When neither responded, Mother threatened to send them to Texas to live with Croft. M.C. cried hysterically. Mother sent A.C. inside the house. M.C. told Mother that Croft had raped her while they lived in Buena Park. The next morning Mother asked A.C. if anyone had touched her. A.C. told Mother that Croft had molested her. After Mother

4

took them to see a doctor, she took them to the police department. M.C. wanted to talk to police because she was concerned for her half-sister who lived with Croft in Texas.

CAST social worker Adriana Ball interviewed M.C. and A.C. in April 2011, 10 years after the incidents. The interviews were recorded.

At the police station a couple months later, M.C. made a covert telephone call to Croft. The call was recorded and later played for the jury at trial. Croft denied touching M.C. inappropriately and apologized that she was "hurting" but stated he could not apologize for something he did not remember doing.

*Trial Court Proceedings*

An information charged Croft with two counts of committing a lewd act on M.C. (Pen. Code, § 288, subd. (a)—counts 1 & 2), and two counts of committing a lewd act on A.C. (Pen. Code, § 288, subd. (a)—counts 3 & 4). As to all counts, the information alleged multiple victim (Pen. Code, § 667.61, subds. (b), (c) & (e)(5)), and substantial sexual contact with a minor (Pen. Code, § 1203.066, subd. (a)(8)), enhancements.

Before trial, the prosecution filed a trial brief. As relevant here, the prosecution sought to admit expert testimony regarding child sexual abuse accommodation syndrome (CSAAS). The prosecution also sought to admit prior sexual offense evidence concerning all three girls pursuant to Evidence Code section 1108 (section 1108). Croft filed a trial brief opposing admission of expert testimony concerning CSAAS and N.B.'s testimony.

At a hearing, the trial court ruled expert testimony concerning CSAAS was admissible. With respect to prior uncharged sexual offense evidence, the trial court ruled the "significant" probative value of the evidence outweighed any prejudicial effect. The court opined that although the evidence may have some prejudice, it would not evoke an emotional bias against Croft. The court explained admission of the evidence would not confuse the jury or necessitate an undue amount of time.

5

*N.B.*

At trial, the prosecution offered N.B.'s testimony pursuant to section 1108. N.B. spent the night at the Croft residence in Texas a couple times a month both when M.C. and A.C. were there and when they were gone. N.B. testified that when she was between four and six years old, Croft raped and sexually molested her. N.B. said Croft rubbed her vagina on multiple occasions. On one occasion, N.B. slept in M.C. and A.C.'s bedroom while they were gone. Croft went into their bedroom, woke up N.B., and told her to come into his bedroom. N.B., with her feet on the floor, bent over the bed and Croft pulled down her underpants, and rubbed lotion on her buttocks. Croft put his penis inside her anus and moved back and forth as he pushed the pillow down over her head. When he was done, Croft pulled up N.B.'s underpants and told her not to tell anyone and to go back to the girls' bedroom. N.B. testified Croft sodomized her like this on more than one occasion. N.B. also testified Croft positioned her in the same manner on the bed and put his penis in her vagina a couple times.

The prosecution offered A.C.'s and M.C.'s testimony as detailed above. As relevant here, M.C. testified on cross-examination as follows. M.C. testified Croft molested her when she was "younger, like five or six." When defense counsel asked her whether she remembered during the CAST interview telling Ball she was "six, seven, and eight[,]" M.C. answered, "Yes." Counsel asked whether the ages she provided during the CAST interview were correct, and M.C. stated that during the interview she was confused about her age when Croft molested her. When counsel asked what grade she was in, M.C. responded, "kindergarten." Counsel asked whether she remembered telling Ball the molestations also occurred when she was in first grade, and M.C. replied, "Yes[,]" and she agreed her memory was better then. When asked, M.C. stated Croft molested her during the day and never at night when Mother was asleep. M.C. did not remember telling Ball that Croft molested her when Mother was asleep.

6

Defense counsel questioned M.C. about the incident that occurred around Christmas. M.C. stated Croft started to molest her but he did not because someone came home. Counsel asked M.C. whether she remembered telling Ball that Croft did molest her, M.C. said she could not remember. After M.C.'s recollection was refreshed with the transcript of her CAST interview, M.C. admitted she told Ball that Croft did molest her. When asked again, M.C. testified Croft did not molest her. M.C. admitted she was having difficulty with her memory.

Defense counsel questioned M.C. about what she told police officers concerning when Croft molested her. When asked, M.C. answered she could not remember whether she told officers Croft molested her over a span of years or when she was in kindergarten. Counsel suggested M.C. was unclear when Croft molested her, and M.C. replied, "I would say kindergarten." When counsel reminded her that she previously said Croft molested her over the course of a few years, M.C. responded, "Correct." After her recollection was again refreshed, M.C. agreed she told Ball that she was "seven, eight-ish, maybe six[]" when Croft molested her.

On redirect examination, M.C. testified she told Ball that Croft molested her primarily when she was in kindergarten at P.E. She also told Ball that Croft may have molested her while she was in preschool when they lived in Texas but she could not remember. M.C. told Ball that Croft moved to Texas possibly when she was in first grade but he was definitely not there when she was in second grade. She could not remember whether Croft sodomized her the day they decorated the Christmas tree.

After A.C. and M.C. testified, the prosecutor sought to admit evidence of their CAST interviews because based on defense counsel's cross-examination the interviews included prior consistent and inconsistent statements (on appeal Croft limits his argument to admission of M.C.'s interview and we thus limit our discussion accordingly). In arguing for the admissibility of M.C.'s *entire* CAST interview, the prosecutor cited to M.C.'s statements concerning when Croft began molesting her

7

(kindergarten), and how often (two to three times per week), and the incident around Christmas. Defense counsel objected to admission of any of M.C.'s statements because there were no prior inconsistent statements. The trial court recessed for the day to read the interview transcripts.

The next day, the trial court stated there were inconsistencies between M.C.'s CAST interview and her trial testimony. The court discussed at length M.C.'s statements at trial and during the CAST interview, noting the inconsistencies concerning when and where Croft began molesting her and whether Croft vaginally penetrated her. Relying on Evidence Code sections 791 (section 791) and 1236 (section 1236), and *People v. Williams* (2002) 102 Cal.App.4th 995 (*Williams*), the court ruled M.C.'s *entire* CAST interview was admissible as prior consistent statements because it was relevant as to M.C.'s credibility and not too prejudicial, time consuming, or misleading. The court added the jury would benefit from the evidence.

*CSAAS Testimony*

Jody Ward, a clinical and forensic psychologist, testified concerning CSAAS, which relates specifically to ongoing sexual molestation between an adult and a child. Ward explained CSAAS consists of the following five components: secrecy; helplessness; entrapment and accommodation; delayed conflicted unconvincing disclosure; and retraction. Ward provided detailed testimony about each component, including the most widely researched component delayed disclosure, which reveals two-thirds of victims do not report sexual abuse until adulthood.

*M.C.'s CAST Interview*

The prosecution offered Ball's foundational testimony in preparation for playing A.C.'s and M.C.'s CAST interviews for the jury. M.C.'s interview began by her providing details about herself and her family; M.C. knew she was there because of "things" that happened when she was younger. When Ball asked her age, M.C. said,

"Um, seven, eightish (SIC), maybe six." M.C. said it happened more than one time. When Ball asked what happened, M.C. said Croft touched her.

M.C. said she could not remember the first time but described one of the earlier times as around Christmas when they were decorating the tree and he told her to come into his bedroom. Croft told her to lay on the bed and he put his penis in her anus. M.C.'s grandparents arrived, and Croft told M.C. to leave the bedroom.

When Ball asked whether that was the first time, M.C. said, "No," there was a time before at night when they were getting ready for bed and he told her to count to 100 and come into his bedroom. M.C. pretended to be asleep, but Croft went to her bedroom, brought her into his bedroom, and put his penis in her anus. Ball asked her how many times Croft sodomized her, and she replied, "Too many to count[,]" and "more than 20." M.C. first stated Croft began abusing her when he would pick her up from preschool and take her to get chips but then said kindergarten and then she could not remember. When asked, M.C. said Croft primarily put his penis in her anus although "he did try to put it in [her] vagina once but like well a couple a times but it was like [she] would scream and . . . he'd stop." Ball attempted to develop a timeline of the abuse.

Ball reminded M.C. she had said Croft began abusing her in preschool or kindergarten. The transcript of the interview indicates they spoke simultaneously and there was background noise but M.C. apparently stated she thought it was kindergarten. She later said preschool in Texas. After M.C. said she went to kindergarten at P.E., she remembered Croft picking her up at preschool in Texas, taking her home, and abusing her. M.C. added she remembered Croft picked her up from kindergarten at P.E., taking her to Rite Aid to buy hot Cheetos, taking her home, and abusing her. M.C. said she went to first grade at P.E. and Croft moved out the end of that year. She said he never abused her again after he moved out. M.C. then stated Croft may have lived with them the beginning of her second grade year. She stated though Croft abused her a couple times a week from the time she was in preschool to the time he moved out. M.C.

9

admitted to Ball that she lied to Mother the first time she asked whether Croft had molested her.

Ball returned to the incident around Christmas, asking M.C. when that happened. M.C. said, "sometime in kindergarten." M.C. added that the other time, when Croft asked her to count to 100, was also in kindergarten. When Ball asked her about the time he put his penis in her vagina, M.C. stated she lay on her back and he put a pillow over her face but she did not remember when it happened. M.C. did not remember any "wet stuff" on her buttocks or vagina, but she remembered him wiping her off with a towel.

*Defense Evidence*

Croft's father testified that after Croft returned to Texas, he did not remember Croft ever going back to California. Croft's brother testified he lived with Croft in Texas in 2001 and 2002. The parties stipulated M.M. would have testified she was Croft's ex-girlfriend and Croft's daughters were comfortable and interacted normally with him when they visited him in Texas.

*Closing Argument, Jury Instructions, Verdicts & Sentencing*

After closing argument, the trial court instructed the jury, as relevant here, with the following: CALCRIM Nos. 220, "Reasonable Doubt"; 1110, "Lewd or Lascivious Act: Child Under 14 Years"; 1191, "Evidence of Uncharged Sex Offense"; 1191A, "Evidence of Uncharged Sex Offense"; and 1193, "Testimony on Child Sexual Abuse Accommodation Syndrome."

The jury convicted Croft of all counts and found true all the allegations. The trial court sentenced Croft to 15 years to life on each of the four counts to run consecutively for a total prison term of 60 years to life.

DISCUSSION

*I. M.C.'s CAST Interview*

Croft argues the trial court erred by admitting evidence of M.C.'s CAST interview. As we explain below, we conclude the trial court properly admitted prior consistent statements M.C. made during her CAST interview but the court erred by admitting the *entire* interview. However, we conclude Croft was not prejudiced.

Evidence Code section 1200 prohibits the admission of hearsay evidence. Section 1236 allows the admission of a witness's hearsay statements that are consistent with her testimony at the hearing subject to section 791. (See Evid. Code, § 1235 [analogous provision for inconsistent statements].)

Section 791 states: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." We review the trial court's hearsay ruling for an abuse of discretion. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

Here, Croft states section 791 "had only limited application in this case" and concedes defense counsel "successfully impeached [M.C.]" on "only a very limited number of matters." Croft focuses on three areas of testimony counsel successfully impeached M.C., i.e., her age, her grade, and the incident around Christmas, and asserts her CAST interview did not include prior consistent statements. The Attorney General discusses only M.C.'s age and grade.

11

On direct examination, M.C.'s testimony established she attended P.E. beginning in kindergarten, when she was six years old, and Croft would pick her up and take her to Rite Aid, where he worked, to buy her hot Cheetos. M.C. described an incident during this time where Croft took her home and sodomized her. She added he sodomized her on more than one occasion during her kindergarten year when she was six years old. M.C. stated she was in kindergarten when Croft told her to count to 100 and come into his bedroom and the incident around Christmas. She did not remember Croft molesting her in Texas. Although M.C. initially testified Croft did not penetrate her anywhere other than her anus, the prosecutor refreshed her recollection with her CAST interview and she stated he put his penis in her vagina twice. M.C. stated she had trouble remembering what happened, she tried to forget it, and her memory about what happened was better when she was 15 years old.

On cross-examination, M.C. initially stated Croft molested her when she was five or six years old. When defense counsel asked M.C. whether she remembered telling Ball that Croft molested her when she was six, seven, and eight years old, she said, "Yes[,]" but she was unsure of her age. She added, "[A]ll [she] remember[ed] [was] . . . being in kindergarten." When counsel asked her whether she remembered telling Ball it also happened in first grade, she said, "Yes." Later when counsel suggested she did not have a clear recollection of when Croft molested her, she said, "I would say kindergarten." Counsel refreshed M.C.'s recollection with a transcript of her CAST interview and twice asked whether she told Ball that Croft molested her when she was six, seven, and eight, and she replied, "Yes."

The trial court properly admitted statements M.C. made during her CAST interview. Because defense counsel impeached M.C.'s credibility regarding her age and grade level during cross-examination, the prosecution was entitled to rehabilitate her credibility through prior consistent statements from her CAST interview within the meaning of sections 1236 and 791, subdivision (a).

12

During her CAST interview, M.C. initially told Ball that she was between six and eight years old and Croft would pick her up from school from the time she was in preschool to first grade, take her where he worked to buy chips, take her home, and sodomize her. M.C. later told Ball she went to kindergarten at P.E., Croft would pick her up from kindergarten, he would take her to the Rite Aid where he worked to buy her hot Cheetos, he would take her home, and he would sodomize her. She added he would sodomize her a couple times a week until he moved to Texas. These statements were consistent with her trial testimony, and were admissible as prior consistent statements.

Croft asserts M.C.'s prior consistent statements from her CAST interview were not prior because her statements concerning kindergarten were not prior to her statements Croft abused her when she was six, seven, and eight years old during the same interview. There is no such requirement. The prior consistent statement, here M.C.'s statements at the CAST interview, must have been made prior to the inconsistent statement, here M.C.'s testimony during cross-examination. Croft relies on *People v. Coleman* (1969) 71 Cal.2d 1159, 1165-1166 (*Coleman*),[2] but that case concerned whether statements were made before the improper motive arose pursuant to section 791, subdivision (b). We are not concerned with that subdivision here.

Relying on *People v. Riccardi* (2012) 54 Cal.4th 758 (*Riccardi*),[3] Croft's primary contention is the trial court erred by admitting M.C.'s *entire* CAST interview instead of those prior consistent statements limited to her age and grade. In *Riccardi*, the trial court admitted the entire audio recording of the victim's friend's two-hour interview with the police pursuant to sections 1236 and 791, subdivision (b). (*Riccardi, supra,*

---

[2]     *Coleman* was overruled on other grounds in *Garcia v. Superior Court* (1997) 14 Cal.4th 953, 966, fn. 6.)

[3]     *Riccardi* was overruled on other grounds in *People v. Rangel* (March 28, 2016, S076785) __ Cal.4th ___.

13

54 Cal.4th at p. 797.) The California Supreme Court concluded the trial court erred by admitting the entire interview. The court explained that although portions of the interview were admissible to refute the defense's characterization of the victim's testimony, the rule of completeness (Evid. Code, § 356) did not warrant admission of the entire interview because the portions relevant to rehabilitate the victim did not create a misimpression requiring admission of the entire interview. (*Riccardi, supra,* 54 Cal.4th at p. 803.) The court opined the victim's friend's long rambling narratives about the history of defendant's relationship with the victim were duplicative and irrelevant. The court, however, concluded the error was harmless. (*Id.* at pp. 804-805.)

In *Williams, supra,* 102 Cal.App.4th at page 1010, the case the trial court relied on here, the trial court admitted into evidence a one-hour videotape of interviews between the police and two witnesses. The court held admission of the entire videotape was proper under sections 1236 and 791, subdivision (b), to refute the defense's claim the witnesses fabricated portions of their testimony. (*Williams, supra,* 102 Cal.App.4th at p. 1011.) The court explained admission of the entire one-hour videotape did not violate Evidence Code section 352 (section 352) because examination of the officer who interviewed the witnesses concerning each of the questions would have consumed a similar amount of time or longer. (*Williams, supra,* 102 Cal.App.4th at p. 1012.) The court added the evidence was duplicative of other evidence and would not have misled or confused the jury. (*Ibid.*)

Here, as we explain above, M.C.'s CAST interview includes prior consistent statements concerning when, where, and how often Croft sexually abused her that were admissible pursuant to sections 1236 and 791, subdivision (a). However, the trial court erred by admitting the *entire* CAST interview in reliance on *Williams*. Like in *Riccardi*, we conclude presentation of the entire interview was improper. The interview included long narratives about M.C.'s family history and upbringing that were irrelevant and statements concerning the details of the incidents that were duplicative and irrelevant

14

to when and where Croft began molesting her. Unlike *Williams*, we conclude here that evidence duplicative of other evidence was irrelevant and unduly time consuming.

Contrary to the Attorney General's claims, admission of the entire interview was not required to prevent misimpressions caused by admitting only portions of the interview or to demonstrate her credibility. The prior consistent statements concerned discrete questions of M.C.'s age, grade, and residence. Evidence of the other statements regarding her family's history and the reporting of the incidents had little, if any, relevance to her age, grade, and residence. Statements M.C. made during her interview concerning her age, grade, and residence alone were relevant and admissible to correct any misimpressions and rehabilitate her credibility. But evidence of these discrete questions did not require admission of her other statements to present a complete picture or further rehabilitate her credibility. Simply put, they were irrelevant to the subject matter of the prior consistent statements. Thus, we conclude the trial court abused its discretion by admitting M.C.'s entire CAST interview.

However, it was not reasonably probable Croft would have received a more favorable result had the trial court not admitted M.C.'s entire CAST interview. (*Riccardi, supra,* 54 Cal.4th at p. 804.) First, a significant portion of M.C.'s statements during her CAST interview lacked substance and were irrelevant. For example, M.C. talked at length about her family and upbringing, and what happened after the incidents. These statements lacked any prejudicial effect. Second, M.C. made statements during her CAST interview that were internally inconsistent and thus impeached her credibility. For example, M.C. first stated Croft began abusing her when she was in preschool, then said kindergarten, and then said she could not remember. Additionally, M.C. initially said Croft moved out the end of her first grade year, but then said Croft maybe lived with them during second grade. These inconsistencies impeached M.C.'s credibility to Croft's benefit.

15

Finally, A.C.'s and N.B.'s testimony were remarkably similar to M.C.'s testimony and provided substantial evidence of Croft's guilt. Their testimony establishes Croft's modus operandi was to use his position of trust to isolate his three- to six-year-old victims. Once he isolated them in a private area, he forced them to lie on his bed face down. He then sodomized the young girls using a pillow to muffle their screams. Croft complains admission of M.C.'s entire CAST interview gave a "boost" to M.C.'s credibility because the jury heard her story twice. Any "boost" to M.C.'s credibility was counterbalanced for the reasons stated above, i.e. much of the interview was irrelevant and M.C.'s credibility was damaged. The real "boost" came from A.C.'s and N.B.'s testimony, corroborating M.C.'s testimony and providing sufficient, if not overwhelming, evidence of Croft's guilt.

Based on the entire record we conclude it was not reasonably probable Croft would have received a more favorable result had the trial court not admitted M.C.'s entire CAST interview. Although we conclude the trial court erred by admitting the entire interview, Croft was not prejudiced.

## II. Section 1108

### A. Admission N.B.'s Testimony

Croft contends the trial court erred by admitting N.B.'s testimony because it was unduly prejudicial. We disagree.

Evidence Code section 1101, subdivision (a), prohibits admission of evidence of an uncharged offense to prove criminal disposition. However, section 1108 creates an exception to this general prohibition in cases involving sexual offenses. Section 1108, subdivision (a), states, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352."

16

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." For purposes of section 352, "prejudice" means "'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]'" (*People v. Heard* (2003) 31 Cal.4th 946, 976.)

In *Harris, supra,* 60 Cal.App.4th at pages 737 to 741, the court articulated the following factors to determine whether evidence of prior sexual acts was properly admitted pursuant to section 1108: (1) the probative value of the evidence; (2) the inflammatory nature of the evidence; (3) the possibility of confusion of the issues; (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses; and (5) remoteness in time of the uncharged offenses. We review the trial court's admission of evidence pursuant to sections 1108 and 352 for an abuse of discretion. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

Here, Croft does not dispute N.B.'s testimony had probative value. "[E]vidence of a 'prior sexual offense is indisputably relevant in a prosecution for another sexual offense.' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282-283 (*Branch*).) Sodomy (§ 286), and lewd and lascivious acts (§ 288) are sexual offenses as defined by section 1108, subdivision (d)(1)(a), and thus, they are relevant in a prosecution of sexual offenses. Additionally, the evidence showed Croft sodomized N.B. in the identical manner he sodomized M.C. and A.C., which shows N.B.'s testimony was no more inflammatory than M.C.'s and A.C.'s testimony.

The only *Harris* element Croft raises is the third element, confusion of the issues. Unfortunately, the Attorney General does not address this element. In fact, the Attorney General does not address any of the *Harris* factors, other than probative value.

17

We remind the Attorney General to support her contentions with reasoned argument. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

"If the prior offense did not result in a conviction, that fact increases the danger that the jury may wish to punish the defendant for the uncharged offenses and increases the likelihood of confusing the issues 'because the jury [has] to determine whether the uncharged offenses [in fact] occurred.' [Citation.]" (*Branch, supra,* 91 Cal.App.4th at p. 284.) "This risk, however, is counterbalanced by instructions on reasonable doubt, the necessity of proof as to each of the elements of a lewd act with a minor, and specifically that the jury 'must not convict the defendant of any crime with which he is not charged.'" (*People v. Frazier* (2001) 89 Cal.App.4th 30, 42 (*Frazier*).)

Here, the trial court did not abuse its discretion in ruling N.B.'s testimony was not likely to confuse or mislead the jury. N.B. described in great detail just one incident where Croft sodomized her and provided generic testimony it happened more than once and he put his penis in her vagina on two occasions. This testimony was nearly identical to M.C.'s and A.C.'s testimony and we can reasonably conclude the jury would not be confused or misled. Additionally, the trial court's instructions countered any risk of confusion. The trial court instructed the jury on the elements of the charged and uncharged offense, reasonable doubt, and the proper use of evidence of prior sexual offenses. There is nothing in the record to indicate the jury was confused by N.B.'s testimony concerning the uncharged sexual intercourse evidence. (*Branch, supra,* 91 Cal.App.4th at p. 284.)

Croft does not contend presentation of and refuting N.B.'s testimony consumed too much time. N.B.'s testimony was relatively brief, consisting of less pages of the reporter's transcript than M.C.'s testimony and about the same as A.C.'s testimony.

Finally, Croft does not contend the offenses concerning N.B. were too remote. Nor could he. The evidence at trial demonstrated the offenses concerning N.B. occurred no more than a few years from the offenses concerning M.C. and A.C. Croft

18

"has failed to carry his burden of rebutting the strong presumption of admissibility of the sexual assault crimes evidence under . . . section 1108." (*People v. Merriman* (2014) 60 Cal.4th 1, 42.) Thus, the trial court did not abuse its discretion by admitting N.B.'s testimony.

## B. Due Process and Equal Protection

Conceding the California Supreme Court in *People v. Falsetta* (1999) 21 Cal.4th 903, 916, resolved this claim against him, Croft argues the issue of whether the admission of propensity evidence pursuant to section 1108 violates due process should be reconsidered and he raises the issue to preserve it for federal review. Pursuant to the doctrine of stare decisis, we are bound by our Supreme Court's decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*).) Croft's due process claim is meritless. For the reasons explained in *People v. Waples* (2000) 79 Cal.App.4th 1389, 1394-1395, and *People v. Fitch* (1997) 55 Cal.App.4th 172, 184-185, we also reject Croft's argument section 1108 violates equal protection.

## C. CALCRIM No. 1191A

Croft asserts the trial court erred by instructing the jury with CALCRIM No. 1191A concerning M.C. and A.C. because it created an improper inference of guilt. Not so.

In a criminal case, with or without a request from the parties, the trial court must instruct on "'the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239.) We review claims of instructional error de novo. (*Id.* at pp. 239-240.)

Over defense counsel's objection, the trial court instructed the jury with CALCRIM No. 1191A, as follows: "*The [p]eople presented evidence that the defendant*

19

*committed the crimes of lewd act on child under 14 years of age* that were charged and not charged in this case, namely, charged and uncharged acts against [M.C.] and [A.C.] in California and Texas. These crimes are defined for you in these instructions. [¶] You may consider this evidence only if the [p]eople have proved beyond a reasonable doubt that the defendant in fact committed the uncharged offenses. [¶] If the [p]eople have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the charged and uncharged sexual offenses, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed the charged offenses. Remember, however, that evidence of another uncharged sexual offense or a sexual offense against another person is not sufficient alone to find the defendant guilty of lewd act on child under 14 years of age ([M.C.] and [A.C.]). The [p]eople must still prove each charge and allegation beyond a reasonable doubt." (Italics added.) CALCRIM No. 1191 instructed the jury on the proper use of N.B.'s testimony.

Contrary to Croft's argument, the above italicized language did not improperly suggest an inference of guilt. Here, like in all criminal cases that go to trial, the prosecution presented evidence the defendant committed a crime. A defendant can then either rest on the state of that evidence, or present his own evidence refuting the prosecution's evidence. The remainder of the instruction *correctly* tells the jury that if it believed beyond a reasonable doubt the prosecution's evidence Croft committed the uncharged sexual offenses, the jury could *not* rely on that evidence *alone* to convict him of the charged offenses. The instruction concludes, "The [p]eople must still prove each charge and allegation beyond a reasonable doubt."

Croft's reliance on *People v. Owens* (1994) 27 Cal.App.4th 1155 (*Owens*), is misplaced. That case involved a prosecution for continuous sexual abuse of a child, and the trial court instructed the jury the prosecution had introduced evidence "'tending to prove'" there were more than three acts of substantial sexual conduct, and defendant

20

could be found guilty if the proof showed beyond a reasonable doubt and the jury unanimously agreed defendant committed three such acts. (*Id.* at p. 1158.) The court held the trial court erred in using the phrase "'tending to prove'" because it carried the inference the prosecution had established defendant's guilt and thereby relieved the prosecution of its burden of proving guilt beyond a reasonable doubt. (*Id*. at pp. 1158-1159.)

Nothing similar occurred in this case. As we explained above, CALCRIM No. 1191A correctly informed the jury that if it concluded Croft committed uncharged sexual offenses against M.C. and A.C., the jury could rely on that evidence to conclude Croft had a propensity to commit sexual offenses against children but it could not rely on that evidence *alone* in determining Croft's guilt of the charged offenses. Unlike the instruction in *Owens*, this was a correct statement of the law. Thus, CALCRIM No. 1191A did not improperly shift the burden of proof to Croft to prove his innocence in violation of his federal constitutional rights.[4]

*III. CSAAS*

*A. Expert Testimony*

Relying on authority from Pennsylvania, Kentucky, and Tennessee, Croft contends "CSAAS evidence should be held inadmissible in California for all purposes." Again we disagree.

CSAAS evidence is routinely admitted in child sexual abuse cases. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *People v. Patino* (1994) 26 Cal.App.4th

---

[4]     Contrary to the Attorney General's claim otherwise, the California Supreme Court in *People v. Villatoro* (2012) 54 Cal.4th 1152, 1167-1169 (*Villatoro*), did not conclude the language at issue here was constitutionally proper. In that case, the court addressed whether a modified version of CALCRIM No. 1191 properly designated the standard of proof to be applied to *charged* offenses. Although the court held the modified instruction did not impermissibly lower the prosecution's burden of proof or interfere with defendant's presumption of innocence, the *Villatoro* court did not expressly approve of the language at issue here. (*Villatoro, supra,* 54 Cal.4th at p. 1168.)

21

1737, 1744-1745 [use of CSAAS evidence does not render trial fundamentally unfair]; see *People v. Brown* (2004) 33 Cal.4th 892, 905-906 [case involving battered women's syndrome discussing *McAlpin* with approval].) To the extent our Supreme Court has recognized that such evidence may be relevant, useful, and admissible in a given case, as an intermediate court, we are in no position to rule otherwise. (*Auto Equity Sales, supra,* 57 Cal.2d at p. 455.) Thus, Croft's reliance on out-of-state authority, *Newkirk v. Commonwealth* (Ky. 1996) 937 S.W.2d 690, *Commonwealth v. Dunkle* (Pa. 1992) 602 A.2d 830, and *State v. Bolin* (Tenn. 1996) 922 S.W.2d 870, is misplaced.

Here, M.C., A.C., and N.B. delayed reporting the sexual abuse for years. Thus, Ward's testimony concerning CSAAS was relevant, useful, and admissible, and its admission did not violate Croft's federal constitutional rights.

B. *CALCRIM No. 1193*

Croft asserts CALCRIM No. 1193 erroneously advises jurors they can consider CSAAS evidence in evaluating the complaining witness's credibility. Croft's claim is meritless.

CALCRIM No. 1193 provided as follows: "You have heard testimony from . . . Ward regarding [CSAAS]. [¶] . . . Ward's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [M.C.'s] and [A.C.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

In *McAlpin, supra,* 53 Cal.3d at page 1300-1301, italics added, footnote omitted, the Supreme Court explained: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's *credibility* when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]

22

'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'"

CALCRIM No. 1193 comports with *McAlpin*. As we explain above, the three girls delayed reporting Croft's sexual abuse for years. Ward's testimony regarding CSAAS was relevant to disabuse the jury of the notion that a child who was abused would have reported the abuse immediately. Therefore, the relationship between CSAAS evidence and the victim's credibility reflected in CALCRIM No. 1193 was proper, and the trial court did not err by giving the instruction.

### IV. Sentence

#### A. Penal Code section 667.61

Croft argues the trial court erred by imposing multiple life terms because Penal Code section 667.61, subdivision (e)(5),[5] does not authorize them when read together with subdivisions (f) and (g).[6] Again we disagree.

---

[5] Because the offenses here occurred before 2006, the trial court applied the pre-2006 version of section 667.61. Thus, we utilize this version of the statute on appeal. Differences between this version and its current version are not material to the appeal.
All further statutory references are to the Penal Code.

[6] Section 667.61, subdivision (f), provides: "If only the minimum number of circumstances specified in subdivision (d) or (e) which are required for the punishment provided in subdivision (a) or (b) to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a) or (b) rather than being used to impose the punishment authorized under any other law, unless another law provides for a greater penalty."
Section 667.61, subdivision (g), states: "The term specified in subdivision (a) or (b) shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion. If there are multiple victims during a single occasion, the term specified in subdivision (a) or (b) shall be imposed on the defendant once for each separate victim. Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including [s]ection 667.6, if applicable."

23

Section 667.61, subdivision (b), provided in relevant part, "[A] person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 15 years except as provided in subdivision (j)."  A violation of section 288, subdivision (a), was a qualifying offense. (§ 667.61, subd. (c)(7).)  One of section 667.61, subdivision (e)'s circumstances is "[t]he defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim."  (§ 667.61, subd. (e)(5).)  The California Legislature enacted section 667.61 to ensure serious sexual offenders receive long prison sentences regardless of their prior criminal records.  (*People v. Wutzke* (2002) 28 Cal.4th 923, 929 (*Wutzke*).)

Croft acknowledges other appellate courts have rejected his arguments. (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1523-1524 (*Valdez*); *People v. Stewart* (2004) 119 Cal.App.4th 163, 171; *People v. Murphy* (1998) 65 Cal.App.4th 35, 40-41 (*Murphy*); *People v. DeSimone* (1998) 62 Cal.App.4th 693, 697-698 (*DeSimone*)), and he concedes the California Supreme Court has relied on *DeSimone* and *Murphy* in deciding other related cases (*Wutzke, supra,* 28 Cal.4th at pp. 931-944; *People v. Jones* (2001) 25 Cal.4th 98, 107).  However, Croft asserts the non-forcible nature of section 288, subdivision (a), warrants different treatment for offenders convicted of this crime.

In *Valdez, supra,* 193 Cal.App.4th at page 1522, the court reasoned:  "'The statutory intent and scheme of . . . section 667.61, subdivision (e)[,] is not difficult to discern.  Where the "present offense" against a victim is a qualifying offense and the gravity of that offense is enhanced by one of the circumstances enumerated in subdivisions (e)(1), (2), (3), (4), (6), or (7), the life sentence mandated by the statute shall apply.  But even in circumstances where the subdivisions enumerated above do not apply, if a qualifying offense has been committed against more than one victim, the criminal conduct is considered equally severe and that conduct merits application of the statute so

24

long as those offenses are prosecuted "in the present case or cases." [Citation.]' [Citations.]" The *Valdez* court also rejected defendant's claim section 667.61, subdivisions (f) and (g), compelled a contrary result. (*Valdez, supra,* 193 Cal.App.4th at pp. 1522-1523.) We find the *Valdez* court's reasoning persuasive, and Croft offers us no compelling reason to depart from it. Therefore, the trial court properly imposed consecutive life sentences for each of the four counts.

B. *Section 654*

Croft alternatively contends imposition of four consecutive life terms violates section 654's prohibition for multiple punishments. Not so.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision . . . ." Section 654 proscribes multiple punishment where all offenses were incidental to one objective. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363.)

Croft acknowledges the court in *People v. Murphy* (1998) 65 Cal.App.4th 35, 41, rejected the identical argument. The court stated, "[I]n making multiple convictions for violent sex offenses punishable by multiple life sentences, the Legislature was expressing the view that multiple violent sex offenses deserve more severe punishment than a single violent sex offense because of the predatory nature of the perpetrator." Additionally, assuming section 654 did apply, it was not implicated.

The trial court found Croft committed separate offenses against separate victims on separate occasions. The trial court did not impose multiple punishments for the same act, nor were the offenses incidental to one objective. Thus, the court's imposition of four consecutive life terms did not violate section 654.

25

*C. Apprendi & Blakely*

Relying on *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, Croft argues the trial court erred by imposing consecutive sentences because the jury did not find the aggravating factors the court relied on to impose consecutive sentencing as required by section 667.61, subdivision (g) (see *supra* p. 23, fn. 4). As Croft acknowledges, this claim has been rejected in *People v. Retanan* (2007) 154 Cal.App.4th 1219 (*Retanan*).

In *Retanan*, the court held the limitation in section 667.61, subdivision (g), did not create a statutory maximum but rather that subdivision was closely analogous to section 654. (*Retanan, supra,* 154 Cal.App.4th at p. 1229.) The court stated section 654 is a discretionary benefit provided by the Legislature to apply in those limited situations where a defendant's culpability is less than the statutory penalty for his or her crimes. (*Retanan, supra,* 154 Cal.App.4th at p. 1229.) The court reasoned that because the *Blakely* rule "does not apply to the determination that defendant does not come within section 654 because that finding is not a factual determination made by a judge that increases the maximum statutory penalty for the particular crime or crimes," the same analysis should apply to section 667.61. (*Retanan, supra,* 154 Cal.App.4th at p. 1229.)

The court concluded as follows: "We find the same reasoning applies to section 667.61, subdivision (g). The maximum penalty in defendant's case was established when the jury convicted him of the predicate offenses and sustained the special circumstance allegations. Subdivision (g), if it applied, would only act to reduce liability if defendant's culpability was less than the statutory penalty for his crimes. Mitigating the maximum statutory punishment does not fall within the rule of *Blakely* and *Apprendi*. The trial court's finding that the subdivision (g) exception does not apply because the offenses are separate does not increase defendant's maximum sentence."

26

(*Retanan, supra,* 154 Cal.App.4th at pp. 1229-1230.)  We find the reasoning in *Retanan* persuasive, and again Croft offers us no compelling reason to depart from it.

Assuming for purposes of argument we were to conclude there was error, we would conclude Croft was not prejudiced.  (*Washington v. Recuenco* (2006) 548 U.S. 212, 222 [*Blakely* subject to harmless error analysis].)  Again, the evidence overwhelmingly established Croft sodomized M.C. and A.C. on separate occasions.  We are convinced beyond a reasonable doubt the jury would have found the offenses were separate (§ 667.61, subd. (g)).  (*Chapman v. California* (1967) 386 U.S. 18, 24.)

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


THOMPSON, J.