Filed 4/25/25  P. v. Washington CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DERRICK WASHINGTON,<br><br>        Defendant and Appellant. | A172574<br><br>(Riverside County<br>Super. Ct. No. RIF2100440) |

After a jury convicted defendant Derrick Washington of committing numerous sexual offenses against his minor sister, Jane Doe, the trial court sentenced him to 235 years to life.  On appeal, defendant maintains the trial court abused its discretion in admitting expert testimony about child sexual abuse accommodation syndrome and that his lengthy sentence constitutes cruel and unusual punishment.  We affirm.

### BACKGROUND

In October 2020, when Jane Doe was 10 years old, she messaged a friend, telling him her half-brother (defendant) sexually abused her when she was younger.  The next day, Doe texted her mother that when she was " 'five or four' " years old, defendant "used to touch me inappropriately, and I didn't tell you this because I was scared.  And please believe me because I'm telling the truth.' "  When mother spoke to her, Doe "was in tears."  Mother

1

contacted the Riverside Police Department and reported what Doe told her. After speaking with an officer, mother took Doe to a forensic interview.

At the interview, Doe could not remember how many times defendant put his penis inside of her vagina, but stated it happened more than once. Doe specifically described six incidents she remembered happening when she was five or six years old. She described one incident where defendant put his penis in her vagina, and Doe remembered "crying because she wanted her dad." Another time, both Doe and defendant were naked and in the bathroom. Defendant sat on the toilet and had Doe sit on him. He then told Doe to pee on him, which she did. Doe felt defendant's penis on her vagina. At some point, mother came home, and defendant told Doe to put on her clothes, commenting, "phew, that was a close one." Doe described other incidents where defendant had Doe take off her clothes and lie down, and "he put his mouth on her vagina and licked her vagina," and where defendant "made her put her mouth on his penis." Doe also recalled that on more than one occasion defendant had shown her pornography. When defendant eventually moved out of the apartment, she "was very happy."

Riverside Police also interviewed defendant, who was 27 years old at the time. In the interview, defendant stated the first time something happened was when he was 21 or 22 years old, and Doe was five or six years old. He stated Doe walked in on him in the shower. She did not leave when he told her to, and instead, she got in the shower and she "pointed at it, then she like touched it." Defendant did not say anything, and then Doe put his penis in her mouth. He said it "was only like just seconds," and then he "pulled it away." When asked how Doe knew how to do that, defendant stated it was "[p]robably that one time when she . . . walked in on me when I was watchin' a porn video." Another time, according to defendant, he was

2

sitting on the toilet and she "just" sat down, facing away from him. His penis touched her vagina, and "it went in a little bit." He recalled "putting his penis in [Doe's] mouth in the shower once," and "six, seven, eight[,] incidents of him putting his penis in her vagina." He maintained it was "only up to like the tip . . . , how far his penis penetrated in her vagina, so not, not that far." He also stated during five to six occasions when he had sex with Doe, he also orally copulated her and she orally copulated him, and separate and apart from those instances, Doe orally copulated him five to six times.

The Riverside County District Attorney filed an information charging defendant with 10 counts of felony oral copulation or sexual penetration with a person 10 years of age or younger (Pen. Code, § 288.7, subd. (b)—counts 1–10)[1] and seven counts of felony sexual intercourse or sodomy with a person 10 years of age or younger (§ 288.7, subd. (a)—counts 11–17). As to each count, the information alleged the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)).

From 2015 to 2018, Doe lived in a Riverside apartment with mother, her father, and defendant. She recounted the sexual assaults she disclosed in the forensic interview, stating that during some of these incidents defendant's penetration was far greater than the tip of his penis. On one occasion he was "moving in and out," and Doe was "crying for [her] dad." Another time, defendant was laying on the bed, and Doe was on top of him, and he "was going in and out." Doe stated she was "kind of numb. I'm pretty sure at that time I was used to it."

Clinical and forensic psychologist Jody Ward testified as an expert in the area of child sexual abuse. Dr. Ward provided an "overarching"

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

3

presentation on "child sexual abuse accommodation syndrome" (CSAAS). She explained, " ' Child sexual abuse accommodation' is a pattern of behaviors that many children exhibit who have been sexually abused within an ongoing relationship. Not all children exhibit all of these behaviors, but many exhibit some. And this syndrome or this pattern of behaviors helps us—as therapists, laypeople, really just as adults—to understand why children do what they do in response to sexual abuse because many times it can be counterintuitive or not what we would expect." The five components of the syndrome are secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction or recantation.

Defendant did not testify and presented no witnesses.

The jury convicted defendant as charged and found true, as to every count, that Doe was a particularly vulnerable victim. The court sentenced defendant to 235 years to life—consecutive terms of 25 years to life for counts 11 through 17, consecutive terms of 15 years to life for counts 1 through 4, and concurrent terms of 15 years to life for counts 5 through 10.

## DISCUSSION

### CSAAS Evidence

"Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held 'myths' or misconceptions about child sexual abuse. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 . . . [(*McAlpin*)].) While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069 . . . ; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 . . . ; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001–1002 . . . ; *People v. Wells* (2004) 118 Cal.App.4th

4

179, 188 . . . ; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406–407 . . . ; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744–1745 . . . ; *People v. Housley* (1992) 6 Cal.App.4th 947, 955–956 . . . ; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449–450 . . . ; *People v. Stark* (1989) 213 Cal.App.3d 107, 116–117 . . . ; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394. . . .)" (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); accord, *People v. Flores* (2024) 101 Cal.App.5th 438, 455; *People v. Ramirez* (2023) 98 Cal.App.5th 175, 214, review denied Feb. 28, 2024 (*Ramirez*); *People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*).)[2]

The prosecutor moved to allow CSAAS testimony.

Defendant, in turn, moved to exclude admission of the evidence on the grounds it was "unduly prejudicial, an undue consumption of time and the purported testimony does not fall outside the scope of ordinary knowledge." Counsel further argued it was "inappropriate to admit CSAAS expert testimony to bolster the victim's credibility," (boldface omitted) pointing out that in *People v. Wilson* (2019) 33 Cal.App.5th 559, 568, 571 (*Wilson*), the court held it was error to admit testimony by a child abuse expert that studies show between " 'one to six percent' " of allegations of sexual abuse are false—because the jury must evaluate a victim's testimony " 'and it should do so without statistical evidence placing a thumb on the scale of guilt.' " (Boldface omitted.)

At the hearing on the motions, defense counsel asked that the CSAAS evidence be limited to "the pillars of CSAAS," and that the expert avoid "[r]elaying specific examples from their own personal practice."

---

[2] We review decisions regarding the admissibility of expert testimony for abuse of discretion. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177, superseded by statue on another ground as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62–63, fn. 8.)

The trial court granted the prosecution's motion to allow the CSAAS evidence but limited the testimony. The expert would "not be able to give any opinion as to this particular case," and she would be "limited to the CSAAS theory . . . in order to address . . . various myths and misconceptions about— or paradoxical behavior with respect to complaining witnesses of this type, that being . . . children who allege child sexual abuse by another person."

At trial, defense counsel renewed his objection that the CSAAS testimony not be "tied into things that Dr. Ward has seen with her own clientele." The court acknowledged the objection and allowed the prosecutor to proceed in calling the witness.

Dr. Ward then testified as an expert in the area of child sexual abuse, providing an "overarching" presentation on "child sexual abuse accommodation syndrome." She discussed the five components of the syndrome: secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and retraction or recantation. In regard to delayed or unconvincing disclosure, Ward stated, "Delayed/unconvincing disclosure is the most widely researched aspect of child sexual abuse accommodation. The research has shown that of [the] children that report sexual abuse—and that's a very small minority. But of the children that do report childhood sexual abuse, two-thirds of people wait until adulthood to report, only one-third report during childhood."

*Reliability of CSAAS*

Defendant first makes a general attack on CSAAS evidence, arguing it "should be inadmissible in California because it is unreliable, and, by its very nature, CSAAS evidence will always support the conclusion that the abuse actually occurred." (Boldface & some capitalization omitted.) Under CSAAS, defendant argues, "any conceivable behavior is a behavior consistent with a

6

child abuse victim," and "[g]iven this reality, the jury cannot possibly avoid using CSAAS to support whatever version of events the victim in any given case describes."

The Attorney General maintains defendant forfeited this challenge to Dr. Ward's testimony by failing to object to it on that ground below. (See *People v. Partida* (2005) 37 Cal.4th 428, 434 [" 'the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable' "].)

Defendant does not dispute that, in the trial court, he did not challenge Dr. Ward's testimony on this ground. Rather, he maintains such objection would have been futile "based on the law as it currently stands" and therefore he has not forfeited the issue. (See *People v. Jones* (2019) 36 Cal.App.5th 1028, 1031 [" 'Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence.' "].) We have no doubt an objection on this ground would have been futile given the decades of case law allowing such evidence. But that does not advance defendant's position on appeal.

As the cases cited above reflect, for over 30 years our courts, including our Supreme Court, have held CSAAS evidence is admissible in criminal trials for the limited purpose of disabusing jurors of "commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*Sedano, supra,* 88 Cal.App.5th at p. 479; see *McAlpin, supra,* 53 Cal.3d at pp. 1300–1301.) The decisions of our high court are, of course, binding on us. (*People v. Johnson* (2012) 53 Cal.4th 519, 527–528; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.)

Furthermore, the Court of Appeal in *Ramirez* rejected the exact argument defendant advances here—that the reasoning of the older cases, including *McAlpin,* is outdated and should be cast aside. (*Ramirez, supra,* 98 Cal.App.5th at p. 216.) We agree with *Ramirez* that such evidence remains helpful to lay jurors. Thus, even if it were proper for us to reconsider the general admissibility of CSAAS testimony, which it is not, we would decline to part company from the established authority.

*Statistical Evidence*

Defendant next targets Dr. Ward's testimony that "[d]elayed/unconvincing disclosure is the most widely researched aspect of child sexual abuse accommodation. The research has shown that of [the] children that report sexual abuse—and that's a very small minority. But of the children that do report childhood sexual abuse, two-thirds of people wait until adulthood to report, only one-third report during childhood." He contends this was improper "statistical evidence" of the sort disallowed by *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*) and *Wilson, supra*, 33 Cal.App.5th 559.

The Attorney General maintains defendant also forfeited this challenge to Dr. Ward's testimony because he did not object to it on this ground in the trial court.

Defendant asserts he "specifically argued that statistical evidence is inadmissible as CSAAS evidence" in his motion in limine, and he was not "required to repeatedly pursue the issue" after the trial court ruled it would allow the evidence.

A " ' "motion in limine to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for

exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." ' " (*People v. Pineda* (2022) 13 Cal.5th 186, 246, italics omitted.)

The difficulty for defendant, however, is that he made a different objection to CSAAS evidence in his motion in limine than the one he advances here. In his motion, defendant argued it would be "inappropriate to admit CSAAS expert testimony to bolster the victim's credibility" (boldface omitted) and noted, "[f]or example," one appellate court, namely *Wilson, supra*, 34 Cal.App.5th 559, held it was error to admit testimony by a child abuse expert that studies show between "one and six percent" of allegations of sexual abuse are false because the jury must evaluate a victim's testimony, " 'and it should do so without statistical evidence placing a thumb on the scale of guilt.' " (Boldface omitted.) At the hearing on the motion, counsel made no mention at all of the inadmissibility of "statistical evidence" to bolster a victim's credibility. Rather, counsel focused on the possibility Dr. Ward might improperly interweave her "personal clinical experiences" into her testimony, and counsel asked the court to "exclude any extraneous testimony of the expert in regards to their practice, their customs, people that they have interviewed because that's not what they are testifying as to." At trial prior to Ward's testimony, defense counsel again objected to any testimony regarding her personal experience. The court responded, "If there's an objection, you're welcome to make it at that moment upon relevant grounds. And I'll be cognizant—the reasons for that because you've highlighted it here. [¶] . . . [¶] If I hear an objection to her testifying regarding the specific case studies because of specific patients, then I would

9

probably sustain the objection. . . . [P]articular examples from her caseload or personal practice . . . would probably be sustained." Ward did not give any such testimony.

In short, while defendant generally mentioned "statistical evidence" in his motion to exclude, his specific objection to Dr. Ward's testimony focused exclusively on the possibility she would interweave her personal experience into her general CSAAS testimony. We therefore agree with the Attorney General defendant forfeited his challenge to Ward's testimony concerning when victims of child sex abuse report the abuse.

Even if the issue was preserved, however, there is no merit to defendant's argument the testimony was improper under *Julian* and *Wilson*.

In *Sedano,* the Court of Appeal addressed and rejected an argument much the same as that made here by defendant. There, the defendant objected to CSAAS testimony that "delayed disclosure was more the rule than the exception based on studies showing that 74 percent of sexually abused children had not disclosed 12 months after the molestation, 50 percent had not disclosed five years later, and another group averaged 10 to 15 years before disclosing," citing to *Julian* and *Wilson.* (*Sedano, supra,* 88 Cal.App.5th at p. 481.) The court explained that unlike in those cases, "the CSAAS expert here gave no testimony about how frequently or infrequently people make false allegations of childhood sexual abuse. Rather, the challenged statistics were regarding (1) how often abused children have a preexisting relationship with their abuser, and (2) how often abused children delay reporting sexual abuse. These statistics could help the jury assess Doe's credibility in the sense that, if a juror believed [the CSAAS expert], they would be less inclined to disbelieve Doe simply because she had a familial relationship with defendant and did not tell anyone of the alleged

10

abuse for many years. These are not statistics that improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do. They are not statistics that 'plac[e] a thumb on the scale for guilt.' [Citation.] Rather, by attempting to dispel two common myths and misconceptions—that abusers are usually strangers to the victim and that victims usually come forward right away—they help the jury objectively 'evaluat[e] the credibility of an alleged child victim of sexual abuse.' [Citations.] This is precisely what CSAAS testimony is meant to do. [¶] The problem in *Wilson* and *Julian* was not that the CSAAS expert used statistics in his testimony but that he used statistics conveying that complainants almost always tell the truth—and therefore that the defendant was most likely guilty." (*Sedano, supra,* 88 Cal.App.5th at pp. 481–482, italics omitted; see *McAlpin, supra*, 53 Cal.3d at p. 1300 [citing with approval to cases allowing "expert testimony on common stress reactions of children who have been sexually molested ('child sexual abuse accommodation syndrome'), which also may include the child's failure to report, or delay in reporting, the abuse"; such evidence "is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation"].)

We therefore reject defendant's assertion that Dr. Ward's testimony encouraged jurors to "make a logical fallacy: (1) The majority of children who are abused wait until adulthood to report the abuse; (2) Doe did not voluntarily disclose during childhood; therefore (3) Doe was abused."[3]

---

[3] Given our determination that the trial court did not err in admitting the proffered CSAAS evidence, we need not, and do not, reach defendant's argument that admission of the evidence was prejudicial.

11

Indeed, the jury was specifically instructed that "testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him" and that the jury could consider the "evidence only in deciding whether or not [Doe's] conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim." (CALCRIM No. 1193.) Dr. Ward's testimony falls squarely within the parameters set forth by this instruction, and we must presume the jury followed these instructions.[4] (*People v. Sibrian* (2016) 3 Cal.App.5th 127, 138.)

In sum, the trial court did not abuse its discretion in allowing the CSAAS evidence.

### Cruel and Unusual Punishment

In his amended sentencing brief, defendant asked the court to sentence him to an indeterminate term of 25 years to life for count 11, with the remaining counts to run concurrently. He claimed there were several factors in mitigation: the crime was committed because of an unusual circumstance that is unlikely to recur (Cal. Rules of Court, rule 4.423(a)(3)); the criminal conduct was partially excusable for some other reason not amounting to a defense (e.g., his age, cognitive development, and developmental disability) (*id.*, rule 4.423(a)(4)); that he had no prior record (*id.*, rule 4.423(b)(1)); he was "suffering from a mental or physical condition that significantly reduced culpability for the crime" (*id.*, rule 4.423(b)(2)); and he voluntarily

---

[4] We likewise reject defendant's argument that Dr. Ward's testimony regarding the reporting of childhood abuse "allowed the jury to make the unreasonable inference that, because Doe acted in ways that children who have been molested act . . . she was a credible witness, despite evidence to the contrary," violating his federal and state due process rights. (See *Lapenias, supra*, 67 Cal.App.5th at p. 174 [courts have rejected due process challenges to CSAAS evidence].)

acknowledged wrongdoing before arrest or at an early stage of the process (*id.*, rule 4.423(b)(8)).  In support of his sentencing request, he attached several "intellectual, cognitive and/or developmental evaluations."

The prosecution sought a maximum term of 325 years to life.

The trial court acknowledged its discretion to impose consecutive or concurrent sentences, and after weighing factors in mitigation and aggravation, sentenced defendant to 235 years to life.[5]  Defense counsel made no objection.

On appeal, defendant contends the sentence amounts to cruel and unusual punishment in violation of his state and federal constitutional rights.  The Attorney General contends this claim was also forfeited because of defendant's failure to object in the trial court.

It has long been established that failing, in the trial court, to raise a cruel and unusual punishment challenge to a sentence forfeits the issue on appeal.  (E.g., *People v. Brewer* (2021) 65 Cal.App.5th 199, 212 (*Brewer*) ["[d]efense counsel did not argue that the sentence constituted cruel and unusual punishment under the United States Constitution or the California Constitution when the trial court indicated the sentence it intended to impose or when the court actually imposed sentence" and therefore the issue was "forfeited" on appeal]; *People v. Baker* (2018) 20 Cal.App.5th 711, 720 (*Baker*).)

Anticipating a forfeiture problem, defendant asserts he received ineffective assistance of counsel when counsel failed to object to the sentence on constitutional grounds.  "To prevail on a claim of ineffective assistance of

---

[5]  The sentence included consecutive terms of 25 years to life for counts 11 through 17, consecutive terms of 15 years to life for counts 1 through 4, and concurrent terms of 15 years to life for counts 5 through 10—resulting in a total term of 235 years to life.

counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant." (*Brewer, supra*, 65 Cal.App.5th at p. 214.)

"California's prohibition on 'cruel or unusual punishment' (Cal. Const., art. I, § 17) has been read to bar any sentence ' "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*Brewer, supra*, 65 Cal.App.5th at p. 213.)[6] "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch* (1972) 8 Cal.3d 410, 423–424 (*Lynch*), superseded by statute on other grounds as explained in *In re Palmer* (2021) 10 Cal.5th 959, 974–975.)

"California courts examine three criteria in assessing disproportionality: (1) the nature of the offense and offender, with emphasis on [his or her] danger to society; (2) the penalty imposed compared with the penalties for more serious crimes in California; and (3) the punishment for

---

[6] Since the federal Constitution affords no greater protection than the state Constitution, we analyze defendant's claim under California law. (See *People v. Martinez* (1997) 71 Cal.App.4th 1502, 1510.)

14

the same offense in other jurisdictions." (*Brewer, supra*, 65 Cal.App.5th at pp. 213–214; accord, *Lynch, supra*, 8 Cal.3d at pp. 425–427.) "In examining the nature of the offense, we ' "look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequence of defendant's acts." ' [Citation.] In examining the nature of the offender, we consider ' "whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' " ' " (*People v. Gomez* (2018) 30 Cal.App.5th 493, 500.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.) Thus, a "defendant must overcome a 'considerable burden' in convincing us his sentence was disproportionate to his level of culpability." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1197.) Indeed, "[o]utside the death penalty context, ' "successful challenges to the proportionality of particular sentences have been exceedingly rare." ' " (*People v. Reyes* (2016) 246 Cal.App.4th 62, 83 (*Reyes*).)

Defendant maintains that at 30 years old—his age at sentencing (he was 21 or 22 years old when he began sexually abusing his sister)—the trial court effectively sentenced him to life without parole. Pointing to United States Supreme Court jurisprudence addressing the Eighth Amendment in connection with juveniles sentenced to life without parole, defendant contends such a sentence "serves no legitimate penal purpose" and that although he was not a juvenile when he committed the crimes, he also was not a "mature adult."

As defendant observes, " '[t]he United States Supreme Court has interpreted the Eighth Amendment to impose unique constraints on the sentencing of juveniles who commit serious crimes. This case law reflects the principle that "children are constitutionally different from adults for purposes of sentencing." ' ([*People v.*] *Contreras* [(2018)] 4 Cal.5th [349,] 359 . . . , quoting *Miller v. Alabama* (2012) 567 U.S. 460, 471 . . . .) However, 'a defendant's 18th birthday marks a bright line.' (*People v. Edwards* (2019) 34 Cal.App.5th 183, 190 . . . .)[7] And . . . '[t]he Eighth Amendment proportionality guarantee applies very differently to prison terms for adult offenders.' (*In re Bolton* (2019) 40 Cal.App.5th 611, 622. . . .) Indeed, the Eighth Amendment's proportionality principle is narrow in the context of noncapital sentences for adult offenders. ([*In re*] *Bolton*, at p. 622; *Edwards*, at p. 190. . . .) 'It " 'does not require strict proportionality between crime and sentence,' " but prohibits " 'extreme sentences that are "grossly disproportionate" to the crime." ' " (*In re Bolton*, at p. 622.)" (*Brewer, supra,* 65 Cal.App.5th at pp. 212–213, italics omitted.)

Looking at the nature of the offense and offender, defendant's sentence was neither cruel nor unusual. His offenses were heinous. He *repeatedly* perpetrated appalling sexual offenses against a young child, his sister, over whom he occupied a position of authority and trust. As our high court observed in *People v. Scott* (1994) 9 Cal.4th 331, 341–342, "Above and beyond the protection afforded to all victims of sexual assault, the Legislature has determined that children are uniquely susceptible to 'outrage' and exploitation." In short, given the seriousness of the offenses defendant committed and the length of time over which they occurred, neither

---

7 Disapproved on other grounds in *People v. Williams* (2024) 17 Cal.5th 99, 137, footnote 12.

defendant's age nor his asserted developmental challenges[8] suggest his sentence is grossly disproportional to the crimes he committed. (See *Baker, supra,* 20 Cal.App.5th at pp. 715, 733 [although the defendant's "insignificant criminal record and low recidivism score point[ed] in his favor, his three separate sexual offenses against [the victim] and abuse of trust against a vulnerable victim d[id] not"; while severe, an indeterminate sentence of 15 years to life for a conviction of oral copulation of the defendant's six-year-old niece was not cruel and unusual punishment]; *Reyes, supra,* 246 Cal.App.4th at pp. 87–88 [life sentence imposed on the 35-year-old defendant who "forced his way into a residence intending to commit heinous multiple sex offenses against a minor" did not "suggest a violation" of state constitutional prohibition against cruel or unusual punishment].)

Moreover, the punishment for the crimes committed—25 years to life for sexual intercourse with a child 10 years of age or younger under section 288.7, subdivision (a), and 15 years to life for oral copulation or sexual penetration under section 288.7, subdivision (b)—is set by the Legislature. "[G]reat deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses." (*In re Wells* (1975) 46 Cal.App.3d 592, 599, superseded by statute in *In re Palmer, supra,* 10 Cal.5th at pp. 974–975; *Brewer, supra,* 65 Cal.App.5th at p. 213 [" '[r]eviewing courts must " 'grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes' " ' "].)

---

[8]  Defendant indicated he had been diagnosed with " 'Tourette syndrome, Asperger's, ADHD and depression,' " and that he had "Pervasive Developmental Disorder, NOS (DSM-IV) (Autism Level one is sub threshold)" and "Borderline Intellectual functioning." (Boldface omitted.)

In comparing his sentence with punishments for other crimes, defendant maintains that while the crimes he committed were "serious and deserving of a lengthy sentence," they were "not as serious as first degree murder—a crime which carries a sentence of only 25 years to life." Implicit in defendant's argument is the assumption that the *multiple* sex offenses he committed against a young child are less serious than a single murder conviction. However, "[t]he penalties for single offenses . . . cannot properly be compared to those for multiple offenses." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)

Additionally, defendant argues that in California, the penal system's "goals are to punish a convicted defendant for the harm caused, deter future criminality, and protect society," and as such a "sentence which exceeds a person's life expectancy accomplishes none of these objectives." However, the fact a sentence exceeds a defendant's life expectancy does not, ipso facto, render it constitutionally cruel or unusual. (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 ["it is immaterial that defendant cannot serve his sentence during his lifetime"].) Indeed, numerous courts have upheld sentences which exceed the defendant's life expectancy. (E.g., *People v. Panighetti* (2023) 95 Cal.App.5th 978, 1000–1004 [280 years to life]; *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1309–1310 [195 years to life]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230–1231 [135 years to life]; *People v. Ayon* (1996) 46 Cal.App.4th 385, 399 [240 years to life], disapproved on another point in *People v. DeLoza* (1998) 18 Cal.4th 585, 600, fn. 1; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 522 [129 years in prison].)

In sum, while defendant's lack of a criminal record, age, and developmental challenges may arguably have weighed in his favor, his *17 separate convictions* for sexual offenses against a child who was his sister and

only *five years old* at the time he began sexually assaulting her, do not. Nor has defendant identified *any* additional information in mitigation that defense counsel could have supplied to the trial court, and there is no suggestion the court was not fully aware of the constitutional bounds of its sentencing discretion. (See *People v. DeJesus* (1995) 38 Cal.App.4th 1, 30.) The trial court duly considered all of the information defendant provided, and where it struck the balance is not so disproportionate to the crimes for which the sentence was imposed as to shock the conscience or offend fundamental notions of human dignity. (See *Brewer, supra,* 65 Cal.App.5th at p. 219 [in rejecting the defendant's cruel and unusual punishment claim, appellate court points out trial court reviewed and considered all the mitigation materials submitted by defendant].)

Accordingly, even had defendant not forfeited the issue, he cannot succeed on an ineffective assistance claim because his sentence is not constitutionally infirm. (See *Brewer, supra,* 65 Cal.App.5th at p. 220 [rejecting ineffective assistance claim because sentence did not violate constitutional prohibitions against cruel and usual punishment; defense counsel could not "be deemed ineffective for failing to make" a meritless argument].)

**DISPOSITION**

The judgment is affirmed.

_____
Banke, Acting P. J.

We concur:


_____
Langhorne Wilson, J.


_____
Smiley, J.

A172574, People v. Washington